[L.A. No. 29881. In Bank. May 19, 1972.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
GARY STEVEN SIMON, Real Party in Interest.

190

## COUNSEL

Evelle J. Younger and Joseph P. Busch, District Attorneys, Harry Wood and Eugene D. Tavris, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Richard S. Buckley, Public Defender, James L. McCormick, Benjamin D. Avan and Dennis A. Fischer, Deputy Public Defenders, for Real Party in Interest.

## OPINION

**MOSK, J.**—Defendant, real party in interest herein, was charged with possession of marijuana. (Health & Saf. Code, § 11530.) His motion to

suppress the evidence on the ground of illegal search and seizure was granted, and the People seek review by statutory writ of mandate. (Pen. Code, § 1538.5, subd. (o).)

In *People* v. *Superior Court* (1970) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449] (hereinafter called *Kiefer*), we determined the constitutionally permissible scope of a warrantless search of a *vehicle* as an incident to the arrest of its driver for an ordinary traffic violation. In the case at bar we are called upon to apply the reasoning of *Kiefer* to a similar search of the *person* of the driver or a fellow passenger. As will appear, we conclude the search here conducted cannot be justified as an incident to defendant's arrest, and hence the trial court correctly granted the motion to suppress.

The motion was heard on the transcript of the preliminary examination, together with additional testimony by defendant. The evidence bearing on the circumstances surrounding the search and seizure was in considerable conflict.

Police Officer Erickson, the sole witness for the People, testified he was on routine vehicular patrol with his partner Officer Amic at 7:30 p.m. on March 9, 1970, when he saw a car "driving without headlights or taillights." He stopped the vehicle and defendant, its driver and sole occupant, "got out of the car voluntarily" and "started to play around under the dash." The officer asked defendant for his identification, and "He stated he had no identification, no registration for the car. I placed him under arrest for his traffic violation under authority of [section] 40302(a) of the Vehicle Code."[1] The officer then searched defendant's person and found in his right front pants pocket a soft plastic bag containing 7.6 grams of marijuana.

On cross-examination counsel asked Officer Erickson, "Did you at any time fear for your life, thinking that [defendant] had a weapon on him?" The officer replied he did not, and further acknowledged that in his patdown search of defendant he found no evidence of any weapon whatever.

Defendant took the stand and testified that his car was a 1957 MG convertible.[2] On the evening in question defendant was driving on the

---

[1]Section 40302, subdivision (a), declares the procedure to be followed after arresting a person for a Vehicle Code violation not amounting to a felony, "When the person arrested fails to present his driver's license or other satisfactory evidence of his identity for examination." We discuss the statute in detail below (Part II A, *post*).

[2]The car was therefore 13 years old at the time of these events. As an additional background matter, we note that defendant informed Officer Erickson he was a law student at the University of Southern California.

street when the ignition caught fire, the car lights went out, and smoke began issuing from under the dashboard. He promptly stopped the vehicle to deal with the problem. The police arrived on the scene a few moments later, but defendant was already standing outside his car with the driver's door open, waving his hands under the dashboard in an effort to clear the smoke. In short, according to defendant, he stopped his car because of the emergency and not because of any order of the police officers.

Defendant testified that before he was asked for identification the officers ordered him to stand spreadeagled against the police car for the purpose of a pat search.[3] In the course of the search Officer Erickson felt a soft lump in defendant's pants pocket and asked what it was; when defendant failed to answer, the officer told him to remove it. Defendant did so, and handed the marijuana to the police.[4]

The trial court found that the officers did stop defendant's vehicle and had "just cause" to do so inasmuch as "the officers told the truth when they asked the defendant for his identification and registration and that he stated that he had no registration or identification, and that it was a lawful arrest under 40302(a) of the Vehicle Code."

Nevertheless the court granted the motion to suppress, finding that "the search, if one was conducted by the officers at that time, was not incident to the arrest because it didn't pertain to the arrest. It would appear that there is no relationship between a search under those circumstances and an arrest. What were they looking for? The cases all hold that the search has to be related to the arrest."

I

Having made no showing that Officer Erickson had a warrant for the arrest or search of defendant, the burden to demonstrate justification for the police conduct rested on the prosecution. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)

 It is first contended that Officer Erickson had probable cause to arrest defendant on a charge of automobile theft (Veh. Code, § 10851),

---

[3]Officer Erickson testified that during the search defendant was not spreadeagled but was "Standing erect, facing towards my vehicle, with his hands at his sides." Although defendant's version of the search posture more closely conforms with recommended police practice, this minor conflict was not and need not be resolved.

[4]Officer Erickson testified he "found" the marijuana in defendant's pocket, implying it was he who reached into the pocket and extracted it. The trial court declined to choose between these two alternatives, and simply found that "in the event the defendant was required to take it from his pocket, it was not by his consent but it was a submission to authority."

and hence that the search of defendant's person was justified as an incident to such an arrest. The facts which the People assert gave Officer Erickson probable cause to believe the car was stolen are, as found by the trial court, (1) that defendant was unable to produce a vehicle registration card or other proof of ownership, and (2) that defendant was unable to produce a driver's license or other personal identification.

Upon registering a vehicle in this state the Department of Motor Vehicles issues a "registration card" to the owner thereof, containing such information as the name and address of the owner, the assigned registration number, and a description of the vehicle. (Veh. Code, §§ 4450, 4453.) Section 4454, subdivision (a), requires that the owner maintain this card or its facsimile "with the vehicle."[5] ■ Our first question is whether a violation of section 4454 gives an officer probable cause to believe the vehicle he has stopped is stolen.

It would not be unreasonable for a thief to remove or destroy the registration card of an automobile he has taken; his purpose in so doing might be to prevent the true owner from being traced, to eliminate the discrepancy between the owner's name and his own, or to facilitate substitution of a forged card. Since the 1967 amendment to section 4454 (fn. 5, *ante*), it is also true that being a stranger to the vehicle he might not be able to present the card to an officer simply because he did not know where to find it.

On the other hand, a motorist's failure to have or produce the registration card for his vehicle could equally well be entirely innocent. A common instance is contemplated by the statute itself: subdivision (b) of section 4454 declares the statute inapplicable "when a registration card is necessarily removed from the vehicle for the purpose of application for renewal or transfer of registration." Renewal, of course, is an annual event (Veh. Code, § 4601), and in contemporary American society automobiles are bought and sold—and titles thereto transferred—with considerable frequency. Moreover, it is not only a thief who may not immediately be able to find the registration card for presentation to an officer; the same difficulty could be experienced by a friend or relative to whom the car had been lent, or even a teenage child or spouse of the owner.

Finally, it bears remembering that section 4454 is essentially a regula-

---

[5] Prior to 1967 the owner was also required to position the card so that it was "plainly visible and legible from the outside of the vehicle." (Stats. 1959, ch. 3, p. 1562.) Since 1967 the owner has been allowed to keep the card anywhere he chooses inside the vehicle (e.g., in the glove compartment); but a section added at that time (§ 4462, subd. (a)) requires him to present the card for examination upon demand of any peace officer. (Stats. 1967, ch. 410, p. 1629.)

tory measure, and does not protect the public from either dangerous driving or unsafe equipment. A violation of its terms is treated by the Legislature as the most minor of offenses: neither a felony nor a misdemeanor, it is a simple "infraction" (Veh. Code, § 40000) punishable upon a first conviction by a fine not exceeding $50 (§ 42001, subd. (a)). It would grossly distort the legislative plan to permit a police officer to magnify such an infraction into grounds to arrest the driver on the serious charge of grand theft of an automobile.[6] We conclude that a motorist's failure to have or produce the registration card for his vehicle, without more, cannot reasonably give rise to the belief that the vehicle is stolen.

A series of Court of Appeal decisions has found such probable cause, however, when a violation of section 4454 was coupled with certain other "suspicious circumstances."[7] First, the opinions emphasize the circumstance—also relied on here by the People—that the defendant was unable to produce a driver's license upon the officer's demand (*Galceran, Myles, Odegard, Jones, Ceccone, James, Mermuys*). Vehicle Code section 12500 requires that all drivers be licensed, and section 12951 requires that every driver have his license "in his immediate possession" while operating a vehicle on the highway (subd. (a)) and present it for examination upon demand of a peace officer enforcing the provisions of the code (subd. (b)). Thus our second question is whether a violation of section 12951, in conjunction with a violation of section 4454 (discussed *ante*), gives the officer probable cause to believe the motorist guilty of automobile theft.

On its face, of course, the presence or absence of a driver's license has no bearing whatever on the matter of title to the vehicle. The only explanation thus far offered in the California cases of the relevance of this circumstance appears in *Galceran*: "To a certain extent, the fact that the driver

---

[6]Automobile theft (Veh. Code, § 10851) is punishable by "imprisonment in the state prison for not less than one year nor more than five years or in the county jail for not more than one year or by a fine of not more than five thousand dollars ($5,000) or by both such fine and imprisonment."

[7]Our research has disclosed the following cases in point: *People* v. *Galceran* (1960) 178 Cal.App.2d 312 [2 Cal.Rptr. 901]; *People* v. *Nebbitt* (1960) 183 Cal.App.2d 452 [7 Cal.Rptr. 8]; *People* v. *Myles* (1961) 189 Cal.App.2d 42 [10 Cal.Rptr. 733]; *People* v. *Odegard* (1962) 203 Cal.App.2d 427 [21 Cal.Rptr. 515]; *People* v. *Jones* (1967) 253 Cal.App.2d 229 [61 Cal.Rptr. 232]; *People* v. *Upton* (1968) 257 Cal.App. 2d 677 [65 Cal.Rptr. 103]; *People* v. *Ceccone* (1968) 260 Cal.App.2d 886 [67 Cal. Rptr. 499]; *People* v. *James* (1969) 1 Cal.App.3d 645 [81 Cal.Rptr. 845]; *People* v. *Clark* (1969) 2 Cal.App.3d 510 [82 Cal.Rptr. 682]; *People* v. *Mermuys* (1969) 2 Cal.App.3d 1083 [82 Cal.Rptr. 902]; *People* v. *Williams* (1971) 17 Cal.App.3d 275 [94 Cal.Rptr. 735]; *People* v. *Farley* (1971) 20 Cal.App.3d 1032 [98 Cal.Rptr. 89]. *Nebbitt, Myles,* and *Odegard* were disapproved in *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699, 703, 712 [94 Cal.Rptr. 412, 484 P.2d 84], on the issue of the validity of a subsequent "inventory" search of the vehicle after it is taken into police custody.

of a car not registered in his name was also unlicensed might be additional evidence that he did not own the car in question, since few automobile owners are not licensed as operators." (*People* v. *Galceran* (1960) *supra,* 178 Cal.App.2d 312, 316.) But this reasoning assumes that the driver is actually unlicensed (Veh. Code, § 12500) rather than simply not in physical possession of his license (§ 12951, subd. (a)). The latter alternative, however, appears to be the fact in almost all the cited cases. Nor is this surprising, for unless the driver confesses outright that he is unlicensed the most the officer knows from personal observation is that he does not have a license "in his immediate possession." Admittedly, even a thief who does own a driver's license might pretend not to have it with him or deliberately fail to carry it, in order to conceal his identity and age in the event he is stopped by the police.

Nevertheless, it is equally likely that the true explanation for a motorist's failure to have his license with him is the most obvious, i.e., that he inadvertently left it in a different suit of clothing—or, in the case of a lady driver, in a different handbag. Such occasional forgetfulness is a fact of human nature, no doubt reinforced by the pressures and demands of modern life. Indeed, we daresay that at one time or another virtually every motorist has suffered the minor embarrassment of leaving his license at home. The Legislature, moreover, recognized this fact when it drastically but wisely tempered the punitive consequences of a violation of section 12951, subdivision (a): not only is such a violation a simple infraction, but even that charge must be dismissed under the statute if the defendant thereafter "produces in court a driver's license duly issued to [him] and valid at the time of his arrest. . . ." In other words, the defendant even though culpable is permitted to purge himself of his offense by a belated presentation of this document.

We conclude that the mere failure of a motorist to have his driver's license in his immediate possession is a circumstance of such generally innocent connotation that it cannot reasonably transform the coincident lack of a registration card into grounds to believe the motorist guilty of grand theft. "The mere absence of registration did not give the officer probable cause to think that the car was stolen. . . . The absence of license and identification makes it no more probable that the car was stolen." (*United States* v. *Day* (E.D.Pa. 1971) 331 F.Supp. 254, 256.)[8]

---

[8]Broad language to the contrary in *People* v. *Myles* (1961) *supra,* 189 Cal.App.2d 42, 46, *People* v. *Odegard* (1962) *supra,* 203 Cal.App.2d 427, 431, *People* v. *Jones* (1967) *supra,* 253 Cal.App.2d 229, 232, and *People* v. *Mermuys* (1969) *supra,* 2 Cal.App.3d 1083, 1087, is disapproved.

This does not mean, however, that police officers are wholly barred from making warrantless arrests for automobile theft on the basis of personal observation; it means only that something more is needed to justify such an arrest than the motorist's inability to produce a registration card or driver's license. The cited decisions of the Courts of Appeal demonstrate there usually have been additional suspicious circumstances which, taken with the considerations just discussed, combine to furnish the necessary probable cause.

To begin with, in several of the cases the officer observed that one or both of the vehicle's license plates were missing or improperly attached (*Galceran, Nebbitt, Odegard, Farley*). Such conditions are not only violations of the code (§§ 5200-5201) and hence grounds for stopping the vehicle and issuing a citation to the driver, they are also relevant to the probable cause question before us.

The lack of a license plate does not alone constitute probable cause to believe the car stolen: the plate may have fallen off, been damaged in an accident or removed by a third party; and in the case of a vehicle recently purchased, the temporary "paper plate" may have become obscured or dislodged. But this circumstance is also highly suspicious: as the court noted in *Galceran*, "It is a matter of common knowledge that automobile thieves often switch license plates from one car to another in order to conceal the identity of the stolen vehicle" (178 Cal.App.2d at p. 316). A thief's first step towards that concealment is to remove both original plates from the vehicle; if he possesses a stolen plate, he will then ordinarily attach it in the rear position; but if he has no such substitute, he may well prefer to drive without any plates rather than risk quick identification from a police "hot sheet." We conclude that when an officer stops a vehicle with missing or improperly attached license plates and in addition learns the motorist is unable to produce the registration card, he may reasonably entertain the belief that the vehicle is stolen.[9]

Other observable circumstances relied on in the cases to invest the lack of a registration card with guilty significance are, for example, the motorist's evasive driving and failure to stop promptly when the officer signals him to do so (*Myles*), and reports of criminal activity in progress in the neighborhood (*Jones*). In both *Myles* and *Jones* the situation presented to the

[9]It is much less suspicious when, as in *James,* the vehicle bears proper license plates but lacks a *current* registration sticker on the real plate. This would ordinarily mean only that the owner had failed to obtain his annual renewal of registration, or had done so but failed to attach his new sticker. Although these omissions are both violations of the code (§§ 4601, 5204), they are not typical of the methods by which an automobile thief seeks to conceal his identity.

officer fully warranted that reliance (cf. also *People* v. *Brown* (1971) 14 Cal.App.3d 507, 511, fn. 1 [92 Cal.Rptr. 473]); but as we admonished with respect to similar circumstances claimed to import culpable meaning to the allegedly "furtive gesture" of bending over inside a vehicle (*People* v. *Superior Court* (1970) *supra,* 3 Cal.3d 807, 825-826), the police must remain alert to the danger of abusing these justifications by invoking them on the basis of inadequate facts (see, e.g., *People* v. *Griffith* (1971) 19 Cal. App.3d 948, 951 [97 Cal.Rptr. 367] [broken wing-window, insufficient grounds to stop motorist on suspicion of automobile theft]).

Secondly, even though the lack of a registration card does not alone furnish the necessary probable cause, it does give the officer reasonable grounds to inquire further into the matter, i.e., to ask the motorist for an explanation of its absence; and a number of the cases have emphasized the significance of answers by the motorist which are inconsistent, conflicting, or palpably false (*Galceran, Nebbitt, Upton, Ceccone, Clark*). Thus in *Galceran* the motorist first said he had bought the vehicle from a used car lot, then that he had bought it from a friend; in *Nebbitt* the motorist said he had borrowed the vehicle from a used car dealer, but a windshield sticker showed the dealer had previously sold it to a third person unknown to the occupants; and in *Upton* the motorist named the alleged owner of the vehicle, but the officer learned by radio that the last registered owner bore a different name. Such answers have no discernible innocent meaning, and may reasonably be taken to indicate consciousness of guilt. They constitute, accordingly, a further suspicious circumstance sufficient to support a belief that the vehicle is stolen.[10]

In the case at bar there is no showing whatever that the license

---

[10]Here again, however, "the police officer should remember there is no substitute for patient and thorough investigation, and should avoid drawing a hasty or preconceived conclusion" (*People* v. *Superior Court* (1970) *supra,* 3 Cal.3d 807, 828) that the motorist's explanation of the lack of his registration card is in fact inconsistent or false. Three of the most recent cases in point are illustrative: in *Williams* the driver told the officer that the car belonged to his brother; in *Mermuys,* to a friend; and in *James* to the driver's cousin whose name he did not know because she had married. But in none of these cases was there any inconsistency or demonstrable falsity in the motorist's story; indeed, in *Williams* and *Mermuys* the officer's check of the license plate number proved negative, and in *James* the statement may not even have been given until the parties reached the police station. Instead, probable cause was predicated in each case on the asserted "insufficiency" or "inadequacy" of the proffered explanation. Yet there may be a substantial difference between an explanation which is patently inconsistent or false and one which simply does not go into enough detail to persuade the arresting officer of its truth. An officer's subjective opinion that a given motorist "should" be able to furnish a more detailed identification of the owner who lent him the car may well fall short of the objective probability of guilt required by the Fourth Amendment to justify an arrest or search without a warrant.

plates on defendant's car were missing or irregular, or that defendant gave inconsistent or false explanations as to its ownership. As noted, the only circumstances upon which the People rely in this regard are defendant's inability to produce his registration card and his driver's license. For the reasons stated above, those circumstances did not furnish Officer Erickson with probable cause to believe defendant was guilty of grand theft of the automobile; accordingly, the search of defendant could not be justified as an incident to such an arrest.

Indeed, there is no showing that the officer in fact believed defendant was guilty of automobile theft: he did not inform defendant that such was the ground for the arrest, and at the preliminary examination he testified only that he arrested defendant for the equipment violations and took him into custody because of his lack of identification. The purpose of the exclusionary rule—to deter unreasonable searches and seizures by law enforcement officers—would clearly be frustrated if the courts were required to uphold a search conducted on unreasonable grounds simply because the prosecuting authorities belatedly managed to devise an alternative theory on which the arresting officer *could* have acted reasonably if he had known of it. Compliance with the fundamental guarantees of the Fourth Amendment is not a game to be won by inventive counsel, but a practical, day-to-day responsibility of law enforcement personnel. Accordingly, just as a warrantless arrest or search cannot be justified by facts of which the officer was wholly unaware at the time (*In re Martinez* (1970) 1 Cal.3d 641, 646 [83 Cal.Rptr. 382, 463 P.2d 734]; *People* v. *Gallegos* (1964) 62 Cal.2d 176, 178 [41 Cal.Rptr. 590, 397 P.2d 174]; see also *People* v. *Hunt* (1967) 250 Cal.App.2d 311, 315 [58 Cal.Rptr. 385]), so also it cannot be justified on theories thereafter invented for the consumption of reviewing courts (see, e.g., *People* v. *Superior Court* (1971) 14 Cal. App.3d 935, 949-950 [92 Cal.Rptr. 545]; *Guevara* v. *Superior Court* (1970) 7 Cal.App.3d 531, 535 [86 Cal.Rptr. 657]).[11]

Furthermore, the People's new theory comes too late: neither at the suppression hearing nor the preliminary examination did the People support the search on this rationale. "To permit the People to inject this new theory into the case would deprive the [defendant] of a fair opportunity to present an adequate record in response. The [defendant] was entitled to assume that the justification for the search was presented before the magistrate. He had no opportunity to mount a legal attack on the theory advanced for the first time before this court, nor to present evidence on

---

[11]For an excellent analysis of this point, see *Agar* v. *Superior Court* (1971) 21 Cal.App.3d 24, 28-32 [98 Cal.Rptr. 148].

cross-examination to rebut the factual basis underlying the additional justification for the search." (*Reinert* v. *Superior Court* (1969) 2 Cal.App. 3d 36, 42 [82 Cal.Rptr. 263]; accord, *People* v. *Adam* (1969) 1 Cal.App. 3d 486, 489 [81 Cal.Rptr. 738]; see also *People* v. *Superior Court* (1971) *supra,* 14 Cal.App.3d 935, 950.)

## II

■ The People's second contention is that the search was justified as an incident to Officer Erickson's arrest of defendant for traffic violations "under authority of [section] 40302(a) of the Vehicle Code."

## A

At the outset, a brief explanation of the statutory reference will be helpful. The exclusive procedure to be followed after a warrantless arrest for a Vehicle Code violation is that prescribed in division 17, chapter 2 (§§ 40300-40604) of the Vehicle Code. (*People* v. *Wohlleben* (1968) 261 Cal.App.2d 461, 463 [67 Cal.Rptr. 826].) If that violation is declared to be a felony, the arrestee is to be dealt with according to the general provisions of the Penal Code on felony arrests. (Veh. Code, § 40301.) For all other cases, however, the Legislature has created a special tripartite scheme which reflects the lesser degree of criminality attached to the act of transgressing against ordinary traffic rules and regulations.

First, the scheme in effect presumes that in the vast majority of cases the violator will not be taken into custody: with the exception of the instances next discussed, the officer must prepare a written notice to appear (i.e., a citation or "ticket"), and must release the violator "forthwith" when the latter in turn gives his written promise that he will appear as directed (§§ 40500, 40504). Indeed, such a violator may entirely avoid the necessity for appearing in court: he may choose to deposit the prescribed bail by mail (§ 40510) and, by failing thereafter to appear, forfeit that amount in lieu of fine (§ 40512).

Second, in certain cases section 40303 gives the officer the option either to follow the foregoing procedure or to take the violator "without unnecessary delay" before the "nearest or most accessible" magistrate having jurisdiction over the offense. The section lists a number of more serious violations as grounds for invoking this option, such as reckless driving, failure to stop after an accident, participating in speed contests, driving with an invalid license, attempt to evade arrest, and refusal to submit to safety inspections.

Third, section 40302 makes it mandatory for the officer to follow the

latter branch of the section 40303 option—i.e., to take the violator before a magistrate without unnecessary delay—in four specific instances: i.e., when the violator (a) fails to present his driver's license or other satisfactory evidence of his identity, (b) refuses to give his written promise to appear, or (c) demands an immediate appearance before a magistrate, or (d) when the violator is charged with the very serious traffic offenses of misdemeanor drunk driving or driving under the influence of toxic glue or nonnarcotic drugs.

The second preliminary matter we must consider is the precise point in time at which a traffic violator is "arrested." ▇ A police officer may legally stop a motorist to conduct a brief investigation when he entertains a rational suspicion, based on specific facts, that a violation of the Vehicle Code or other law may have taken place (see *People* v. *Griffith* (1971) *supra,* 19 Cal.App.3d 948, 950-951, and cases cited), and the temporary restraint of the suspect's movements incident to that investigation will not ordinarily be deemed an arrest. But when the officer determines there is probable cause to believe that an offense has been committed and begins the process of citing the violator to appear in court (Veh. Code, §§ 40500-40504), an "arrest" takes place at least in the technical sense: "The detention which results [during the citation process] is ordinarily brief, and the conditions of restraint are minimal. Nevertheless the violator is, during the period immediately preceding his execution of the promise to appear, under arrest. [Citations.] Some courts have been reluctant to use the term 'arrest' to describe the status of the traffic violator on the public street waiting for the officer to write out the citation [citations]. The Vehicle Code, however, refers to the person awaiting citation as 'the arrested person.' Viewing the situation functionally, the violator is being detained against his will by a police officer, for the purpose of obtaining his appearance in connection with a forthcoming prosecution. The violator is not free to depart until he has satisfactorily identified himself and has signed the written promise to appear." (Fns. omitted.) (*People* v. *Hubbard* (1970) 9 Cal.App.3d 827, 833 [88 Cal.Rptr. 411].)

There is no doubt, of course, that a motorist who is actually taken into police custody for transportation before a magistrate pursuant to section 40302 (or 40303) is "under arrest" in the traditional sense of the term. (Pen. Code, §§ 834, 835; *People* v. *Hatcher* (1969) 2 Cal.App.3d 71, 75 [82 Cal.Rptr. 323].) This explains why Officer Erickson and the trial judge in the case at bar both stated that defendant was arrested "under 40302(a) of the Vehicle Code." But such language is at best a kind of verbal shorthand. Upon analysis it will be seen that one cannot be arrested on the sole authority of section 40302: "such section [§ 736, predecessor to § 40302]

is not penal in nature and cannot form the basis for a lawful arrest."
(*People* v. *Randolph* (1957) 147 Cal.App.2d Supp. 836, 841 [306 P.2d 98].)
The section by its terms applies only when a person "is arrested for any
[nonfelony] violation of this code" and one of the four specified conditions
is met. It thus assumes the violator has already been arrested under a sub-
stantive provision of the code, and simply declares the procedure which is
then to be followed.

Thus viewed, a principal purpose of the statute becomes apparent. The
citation procedure of section 40500 (discussed *ante*) is essentially an honor
system, requiring the good faith and cooperation of the person cited. At the
very least, he must be able to convince the officer—either by exhibiting his
driver's license or by "other satisfactory evidence"—that the name he is
signing on the written promise to appear corresponds to his true identity
(see also § 40504, subd. (b) [signing such a promise with a false name is a
misdemeanor]). When he cannot do so the officer has no assurance the
promise will be honored, and under those circumstances subdivision (a)
prohibits the use of the citation procedure. (*People* v. *Mercurio* (1970) 10
Cal.App.3d 426, 430 [88 Cal.Rptr. 750].)

## B

Proceeding to the merits, we inquire into the constitutionally permissible
scope of a search of the person as an incident to an ordinary traffic arrest.

We take as the point of departure our *Kiefer* decision (*People* v. *Superior
Court* (1970) *supra*, 3 Cal.3d 807), in which we reiterated certain basic
principles also bearing on the case at hand. ■ Thus, "It is now settled
that as an incident to a lawful arrest, a warrantless search limited both as to
time [citation] and place [citation] may be made (1) for instrumentalities
used to commit the crime, the fruits of that crime, and other evidence
thereof which will aid in the apprehension or conviction of the criminal;
(2) for articles the possession of which is itself unlawful, such as contra-
band or goods known to be stolen; and (3) for weapons which can be used
to assault the arresting officer or to effect an escape." (*Id.* at pp. 812-813.)
■ A search may be incident to a lawful arrest, however, and yet be
unlawful because it was "unreasonable in scope": that scope must be
"strictly tied to and justified by" the particular circumstances which initially
permitted the search. (*Id.* at pp. 813-814.)

In applying these rules, the first two categories listed above present little
difficulty. ■ In the case of an ordinary traffic offense there are neither
"instrumentalities" used to commit the crime nor "fruits" or "evidence"
thereof, so that a search for such items as an incident to the driver's arrest

is unreasonable per se, whether conducted in his vehicle (*id.* at p. 813) or on his person.[12]

■ With respect to contraband, we said in *Kiefer* that "in the typical traffic violation case . . . the 'circumstances justifying the arrest'—e.g., speeding, failing to stop, illegal turn, or defective lights—do *not* also furnish probable cause to search the interior of the car." (*Id.* at p. 814.) If the arresting officer "cannot reasonably expect to discover either instrumentalities or fruits or seizable evidence of the offense; still less does the arrest give him reasonable grounds to believe, without more, that the vehicle contains contraband. . . . To justify that search, there must be independent probable cause to believe the vehicle does in fact contain contraband." (*Id.* at pp. 814-815.) This reasoning applies with equal force to a search of the driver, and to justify such a search there must likewise be independent probable cause to believe that contraband is in fact secreted on his person.

The scope of a search for weapons after a routine traffic arrest, however, is a more complex problem which has evoked differing responses from the courts. A leading case in point is *People* v. *Marsh* (1967) 20 N.Y.2d 98 [281 N.Y.S.2d 789, 228 N.E.2d 783]. There the defendant was arrested on a traffic warrant issued for a speeding violation committed two years earlier; in a search of the defendant's person conducted incident to that arrest, a paper was found in a book of matches and was thereafter used to convict him on a gambling charge. The New York Court of Appeals reversed the judgment and directed the suppression of the evidence and dismissal of the information. On the point in issue the court reasoned (at p. 101): "The search for weapons is a special exception to the proscription against warrantless searches, and it should not be extended beyond its purpose of securing the safety of the officer and preventing an escape. A motorist who exceeds the speed limit does not thereby indicate any propensity for violence or iniquity, and the officer who stops the speeder has not even the slightest cause for thinking that he is in danger of being assaulted. We can only conclude that, even though the 'rules of criminal

---

[12]In *Kiefer* (at p. 813, fn. 2) we recognized an exception to this rule when the motorist is arrested for driving under the influence of alcohol or other drug: "The presence of the latter substances in the vehicle is admissible as corroborating evidence of these crimes, and a reasonable search therefor may be conducted in the interior of the vehicle in which such an offender is apprehended, as an incident to that arrest." Their presence on his person, of course, is equally admissible, and he may be searched for such substances as a further incident to the arrest. (*People* v. *Yniguez* (1971) 15 Cal.App.3d 669, 672-673 [93 Cal.Rptr. 444].) That search, however, must remain reasonable in scope. (Cf. *People* v. *Gil* (1967) 248 Cal.App.2d 189, 192 [56 Cal.Rptr. 88], questioned on other grounds in *People* v. *Superior Court* (1970) *supra*, 3 Cal.3d 807, 825, fn. 11.)

law are generally applicable' to traffic violations [citation], the Legislature never intended to authorize a search of a traffic offender unless, when the vehicle is stopped, there are reasonable grounds for suspecting that the officer is in danger or there is probable cause for believing that the offender is guilty of a crime rather than merely a simple traffic infraction."

Nor did the Legislature intend a different result, said the New York high court, simply because the arrest is based on an outstanding traffic warrant: "the statutory scheme does not contemplate treating him as a common criminal to be booked, photographed, fingerprinted and jailed. It is equally degrading—and most assuredly not the Legislature's intention—to subject him to the affront of a search when one is not necessary for the proper execution of the warrant. In short, no search for a weapon is authorized as incident to an arrest for a traffic infraction, regardless of whether the arrest is made on the scene or pursuant to a warrant, unless the officer has reason to fear an assault or probable cause for believing that his prisoner has committed a crime [other than a traffic offense]." (*Id.* at p. 102.) And the New York court concluded by holding that this limitation on a weapons search was also compelled by the Fourth Amendment to the United States Constitution.

One year later the United States Supreme Court decided *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], and *Sibron* v. *New York* (1968) 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889], holding that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (392 U.S. at p. 30 [20 L.Ed.2d at p. 911].) The high court explained (at p. 27 [20 L.Ed.2d at p. 909]) that "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citations and footnote omitted.] And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." The importance of these decisions to our inquiry will soon become apparent.

The first California case to construe the *Terry* language in the context of a traffic arrest was *People* v. *Graves* (1968) 263 Cal.App.2d 719 [70 Cal. Rptr. 509]. There the defendant, a robbery suspect, was arrested on outstanding traffic warrants; a thorough search of his person was conducted,

turning up a packet of marijuana cigarettes. In reviewing the legality of that search and seizure, the Court of Appeal declared as follows (at pp. 733-734): "[A] valid arrest for a traffic offense permits a search by the arresting officer of the arrestee's person for weapons, but does not justify a complete search of his person for evidence of other unrelated crimes unless the officer has probable cause for believing that the traffic offender is guilty of a crime other than the traffic offense for which he is being arrested."

To justify its rule allowing a routine weapons search in every traffic arrest situation, the Court of Appeal reasoned (at p. 734): "The rationale of *Marsh, supra,* that traffic offenders are usually noncriminals and therefore should not be subjected to the indignity of even a search for weapons must yield to the principle espoused in *Terry* and *Sibron, supra,* that a police officer may make a reasonable self-protective search for weapons if he has a constitutionally adequate reasonable ground for doing so, subject to the limitation that the scope of the search must be reasonably related to and justified by the circumstances which rendered its initiation permissible. In the case of a valid arrest the constitutional adequacy is supplied by the arrest itself. . . ."

We do not so read *Terry* and *Sibron.* It is true, as the *Graves* court emphasized (*ibid.*), that "the danger to the officer and the possibility of an escape are present if the arrestee possesses a weapon regardless of whether the weapon is in any way related to the crime for which he has been arrested." This is self-evident. Conversely, however, those dangers are also present when the officer has detained and is interrogating an armed suspect in circumstances which may still fall short of probable cause to effectuate the arrest. The participants are often unsure of the precise moment at which such a detention becomes an "arrest" in the legal sense (see Part II A, *ante*), and the suspect does not have significantly less incentive or temptation to use his weapon before than after that elusive moment. In short, the physical risk to the officer is created by the circumstances of the confrontation taken as a whole, not by the technical niceties of the law of arrest. The critical question remains, is this the kind of confrontation in which the officer can reasonably believe in the possibility that a weapon may be used against him?

The actual holding of *Graves* illustrates the point: in addition to the outstanding traffic warrants, the officer in that case had independent probable cause to arrest the defendant for five recent armed robberies, the last committed only three hours before he stopped the defendant for irregular driving. Fully aware of these facts, he approached the car with a drawn

gun and immediately placed the defendant in handcuffs. Manifestly in such circumstances it was reasonable for the officer to believe that the arrestee was armed and dangerous, and to take appropriate precautionary measures. Nor is it necessary, to support such a belief, that the crime for which the suspect is arrested ordinarily be committed by means of offensive weapons: in *Peters* v. *New York,* reported *sub nom. Sibron* v. *New York* (1968) *supra,* 392 U.S. 40, a companion case to *Terry,* the officer had reasonable cause to arrest the defendant on a charge of attempted burglary. Upon apprehending him the officer conducted a pat-down search for weapons and felt a hard object which might have been a knife; he removed it and found it to be a small package of burglar's tools. The United States Supreme Court upheld the search as incident to the arrest for attempted burglary, and reasonably limited in scope. (*Id.* at p. 67 [20 L.Ed.2d at p. 937].)

Our analysis here, however, deals with an arrest not for robbery or burglary or possession of narcotics, but for a simple traffic violation. In extending the authority for a weapons search to that class of arrests, the *Graves* court was apparently motivated by its judicial "knowledge" that "police officers have been killed or assaulted while making arrests for traffic offenses" and such arrests "frequently disclose that the arrestee is wanted by the authorities for the alleged commission of another crime or crimes or that he is a fugitive from justice." (263 Cal.App.2d at p. 735.) This concern for the safety of traffic officers is commendable, and we fully shared it in *Kiefer*: "We are not unmindful of the dangers daily faced by the men who bear the burden of policing our streets and highways, and of the fact that even a minor traffic citation incident can occasionally erupt into violence. We agree with the United States Supreme Court that 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. . . .' The courts should do all in their constitutional powers to minimize these risks." (3 Cal.3d at p. 829, quoting from *Terry* v. *Ohio,* at p. 23 of 392 U.S. [20 L.Ed.2d at p. 907].)

The question, nevertheless, is whether these risks eventuate "frequently," as the *Graves* court believed, or "occasionally," as we asserted in *Kiefer*. While statistical certainty is impossible, we adhere to *Kiefer's* common-sense appraisal of the situation: "Millions of such vehicles [involved in routine traffic violations] are stopped every year, and all but a small proportion are doubtless proceeding at the time on lawful business or innocent pleasure." (Fn. omitted; 3 Cal.3d at p. 815.) We concluded in *Kiefer* (at p. 829) that "Just as the arresting officer in an ordinary traffic violation case cannot reasonably expect to find contraband in the offender's vehicle,

so also he cannot expect to find weapons. To allow the police to routinely search for weapons in all such instances would likewise constitute an 'intolerable and unreasonable' intrusion into the privacy of the vast majority of peaceable citizens who travel by automobile. It follows that a warrantless search for weapons, like a search for contraband, must be predicated in traffic violation cases on specific facts or circumstances giving the officer reasonable grounds to believe that such weapons are present in the vehicle he has stopped."

This reasoning is equally applicable to a search of the driver. We agree with the above-quoted observation of the New York Court of Appeals in *Marsh* (20 N.Y.2d at p. 101) that the ordinary motorist who transgresses against a traffic regulation "does not thereby indicate a propensity for violence or iniquity," and the officer who stops him generally "has not even the slightest cause for thinking that he is in danger of being assaulted." Moreover, a search of the driver's person is obviously no less an invasion of privacy than a search of his vehicle, even when it is limited to a pat-down: as the United States Supreme Court said in *Terry*, "it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." (Fns. omitted; 392 U.S. at pp. 16-17 [20 L.Ed.2d at p. 903].) ■ We therefore conclude that when a police officer observes a traffic violation and stops the motorist for the purpose of issuing a citation, a pat-down search for weapons as an incident to that arrest must be predicated on specific facts or circumstances giving the officer reasonable grounds to believe that a weapon is secreted on the motorist's person.[13] Language to the contrary in *Graves* (263 Cal.App.2d at p. 733) is disapproved.[14]

---

[13]The same rule applies when the officer stops or detains the motorist under authority of an outstanding arrest warrant issued for failure to respond to a prior traffic citation. (Veh. Code, §§ 40514, 40515.) "The warrant does no more than authorize the police officer to make an arrest for an offense which he did not witness. It does not give him any greater power to conduct a search than he would have possessed had he actually seen the infraction and thereupon stopped the offender." (*People* v. *Marsh* (1967) *supra*, 20 N.Y.2d 98, 102; accord, *Carpio* v. *Superior Court* (1971) 19 Cal.App.3d 790, 793 [97 Cal.Rptr. 186].)

Nothing we say here, however, is meant to cast doubt on the use by the police, when appropriate, of other precautionary measures which constitute a lesser intrusion than a pat-down search, such as directing the suspect to alight from his car or to keep his hands in sight. (See Tiffany, McIntyre & Rotenberg, Detection of Crime (1967) pp. 48-52.)

[14]Other cases relying on the *Graves* rule are *People* v. *Nunn* (1968) 264 Cal.App. 2d 919, 923-925 [70 Cal.Rptr. 869]; *People* v. *Weitzer* (1969) 269 Cal.App.2d 274,

Both state and federal precedents support this conclusion. In *People* v. *Hana* (1970) 7 Cal.App.3d 664 [86 Cal.Rptr. 721], a police officer stopped the defendant's panel truck because of a defective brake light (Veh. Code, § 24603). In checking the operation of the light the officer saw several matchbooks inside the vehicle which could be used to hold marijuana cigarettes. With the defendant's consent the officer began a search of the vehicle, but interrupted it to conduct a pat-down of the defendant and his passengers. He felt a soft lump in the defendant's pocket, and withdrew a plastic bag of marijuana. The ensuing conviction of possession of marijuana was reversed by the Court of Appeal on the ground, inter alia, that under the test of *Terry* and *Sibron* the pat-down search was not justified: "Although defendant had been initially properly stopped for a valid reason, the examination of the faulty brake light, there was no reason for [the officer] to believe that defendant and his companions were armed or dangerous," nor any circumstances from which that conclusion "could be reasonably inferred" (*id.* at p. 669). Other Courts of Appeal have recognized that a pat-down search may be conducted after a traffic arrest by an officer "reasonably fearing possible violence" (*People* v. *Superior Court* (1971) *supra,* 14 Cal.App.3d 935, 943, fn. 3; *People* v. *Mercurio* (1970) *supra,* 10 Cal.App.3d 426, 429-430; see also *People* v. *Figueroa* (1969) 268 Cal.App.2d 721, 726 [74 Cal.Rptr. 74]), and the weight of authority in our sister states imposes such a limitation on the right of the police to conduct a search for weapons in these circumstances.[15]

Finally, it is also the federal rule on the point: in *United States* v. *Davis* (9th Cir. 1971) 441 F.2d 28, a police officer stopped the defendant's car for the traffic offenses of crossing the center line and driving and parking on the wrong side of the street; he immediately conducted a pat-down search of the defendant, and felt a large bulge in a pants pocket which was discovered to be a roll of counterfeit bills. The circuit court reversed the defendant's conviction of possession of counterfeit Federal Reserve notes, and directed dismissal of the indictment. Applying the test of *Terry* the court found no grounds on which the officer could reasonably have believed the defendant was armed and dangerous, and therefore held the

---

290-291 [75 Cal.Rptr. 318]; *Taylor* v. *Superior Court* (1969) 275 Cal.App.2d 146, 149 [79 Cal.Rptr. 677]; and *People* v. *Dukes* (1969) 1 Cal.App.3d 913, 916 [82 Cal.Rptr. 218].

[15]In addition to the New York case of *People* v. *Marsh, supra,* see *Curtis* v. *State* (Minn. 1971) 190 N.W.2d 631, 635 [9 Crim.L.Rep. 2381]; *People* v. *Watkins* (1960) 19 Ill.2d 11 [166 N.E.2d 433, 437]; *People* v. *Zeigler* (1960) 358 Mich. 355 [100 N.W.2d 456, 460]; but see *Barnes* v. *State* (1964) 25 Wis.2d 116 [130 N.W.2d 264, 268-269]; cf. *State* v. *Campbell* (1969) 53 N.J. 230 [250 A.2d 1, 5]; *Shelton* v. *State* (1968) 3 Md.App. 394 [239 A.2d 610, 613].

search to be impermissible. (Accord, *United States* v. *Humphrey* (10th Cir. 1969) 409 F.2d 1055, 1057-1058.)

■ Turning to the facts before us, we observe that defendant was initially stopped for driving during darkness (Veh. Code, § 280) without lighted headlamps or taillamps (§§ 24250, 24400, 24600). These are simple infractions (§ 40000), punishable upon a first conviction by a fine not exceeding $50 (§ 42001, subd. (a)). As noted earlier (Part I, *ante*), the same is true of defendant's inability to present his driver's license and registration card; and if he had produced any other "satisfactory evidence of his identity," he would have been entitled as a matter of right to be released immediately upon signing a promise to appear. Beyond these traffic violations, however, there were no other facts or circumstances from which Officer Erickson, as a reasonably prudent man, could have inferred that defendant was carrying a concealed weapon. Indeed, we have already pointed out that when asked on cross-examination, "Did you at any time fear for your life, thinking that [defendant] had a weapon on him?" Officer Erickson replied in the negative. The pat-down search of defendant cannot be justified as an incident to Officer Erickson's decision to cite him for the foregoing traffic offenses.

## C

■ Pressing the analysis further, the People emphasize that Officer Erickson not only had probable cause to issue the traffic citations to defendant but was required by Vehicle Code section 40302 to take him into custody for transportation before a magistrate in order to make bail; this fact, it is urged, justified the search of defendant. We therefore address ourselves to an issue which has recently caused much uncertainty and conflict among the Courts of Appeal, namely, the constitutionally permissible scope of a search of a traffic violator who is required to be transported before a magistrate pursuant to Vehicle Code section 40302.[16]

■ When a suspect has been lawfully arrested on a criminal charge and undergoes the process of "booking" at a police station prior to being held in jail (Pen. Code, § 7, subd. 21), it is ordinarily reasonable to conduct a search of his person for the purpose of preventing the introduction of weapons or contraband into the jail facility. (*People* v. *Ross* (1967) 67 Cal.2d 64, 70 [60 Cal.Rptr. 254, 429 P.2d 606], revd. on other grounds *sub nom. Ross* v. *California* (1968) 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]; *People* v. *Munsey* (1971) 18 Cal.App.3d 440, 448 [95 Cal.

---

[16]Our conclusion herein will also govern the situation in which an arresting officer decides to exercise his option to transport a traffic violator before a magistrate pursuant to section 40303.

Rptr. 811], and cases cited.) From this premise the argument has been drawn that for the sake of safety a search of this kind need not be postponed until the actual booking but may reasonably be conducted "in the field," i.e., at the time of the arrest, whenever the suspect will be charged with a "jailable" offense.

Whatever the merits of this argument in generality, it is inapplicable to the case at hand. As noted above (Part II A, *ante*) sections 40300-40604 of the Vehicle Code provide the *exclusive* procedure to be followed after making a warrantless arrest for a traffic violation not amounting to a felony, and those provisions must be read together to effectuate the deliberate legislative scheme they embody. Section 40302 requires that a person coming within its terms be taken "without unnecessary delay" before the "nearest or most accessible" magistrate having jurisdiction, and sections 40306 and 40307 prescribe the next step in the procedure: if a magistrate is available, section 40306 provides (a) the arresting officer shall file a complaint, (b) the arrestee shall be given at least five days' continuance to prepare his case and (c) "shall thereupon be released from custody" on his own recognizance or on bail; if on the other hand a magistrate is not available, section 40307 provides that the officer shall take the arrestee before (a) the clerk of the magistrate "who shall admit him to bail" or (b) the officer in charge of the most accessible jail "who shall admit him to bail" or release him upon a simple written promise to appear.

The clear and unmistakable import of these provisions, when read together, is that a person taken into custody pursuant to section 40302 must be transported *directly* to a magistrate or to one of the officials listed in section 40307, and must *immediately* be released on bail or written promise to appear.[17] Accordingly, he cannot lawfully be subjected to the routine booking process used in the case of a nontraffic misdemeanant; nor can he be searched as an incident of that process, either in the field or at a police station. We conclude that the search of defendant in the case at bar cannot be justified as an incident to Officer Erickson's decision to take him into custody for transportation before a magistrate pursuant to section 40302.

Two leading Court of Appeal decisions are in accord. In *People* v. *Dukes* (1969) *supra,* 1 Cal.App.3d 913, a police officer stopped the defendant for speeding and observed his passenger, Mitchell, drinking from an open beer bottle. Neither had satisfactory identification, and the police invoked the provisions of section 40302, subdivision (a). Both men were then thor-

---

[17]This requirement is qualified only in cases in which a temporary detention is necessary to permit a motorist to recover from alcoholic or narcotic intoxication sufficiently to be released with safety to himself and to the public. (*People* v. *Yniguez* (1971) *supra,* 15 Cal.App.3d 669, 673.)

oughly searched without a prior pat-down, and a small quantity of marijuana was found in the pockets of each. Reversing the defendant's conviction of possession of marijuana on the ground of illegal search and seizure, the Court of Appeal reasoned at page 916: "That the officers were warranted in taking both Mitchell and Dukes into custody for the traffic offenses because of their unsatisfactory identification does not expand the scope of the search permissible under the Fourth Amendment to the United States Constitution. Conceding a person arrested for a jailable offense might be searched for contraband in the field (since he may be thoroughly searched when booked to prevent contraband from being introduced into the jail), the custody allowed under Vehicle Code section 40302, subdivision (a), is limited to taking the arrestee before a magistrate. If the magistrate is unavailable, the officer must take the arrestee before the clerk of the magistrate or the officer in charge of the jail so he may be admitted to bail (Veh. Code, § 40307; . . .)."

Again, in *People* v. *Mercurio* (1970) *supra,* 10 Cal.App.3d 426, a police officer observed the defendant, a pedestrian, cross an intersection against a "Don't Walk" signal, and arrested him for that violation (Veh. Code, § 21456, subd. (b)). When the defendant was unable to produce any identification the officer transported him to the police station, purportedly pursuant to section 40302. There he was subjected to a "strip search" and some marijuana was found in his clothing. His motion to suppress this evidence was denied, and he entered a plea of guilty. Reversing the ensuing judgment on the ground of illegal search and seizure, the Court of Appeal held that section 40307 governed the case and that statute did not authorize a booking search prior to appearance before the magistrate; relying on *Dukes,* the court concluded (at p. 432) that "the arrest of appellant was lawful, but the failure of the officers to take him before a magistrate, or to a person accepting bail in accordance with schedule, deprived the subsequent jailhouse search of validity."[18]

A divergent line of cases, however, has developed from the decision in *Morel* v. *Superior Court* (1970) 10 Cal.App.3d 913 [89 Cal.Rptr. 297]. (E.g., *Pugh* v. *Superior Court* (1970) 12 Cal.App.3d 1184, 1188 [91 Cal. Rptr. 168]; *People* v. *Brown* (1971) 14 Cal.App.3d 507, 511 [92 Cal. Rptr. 473].) Departing from the prior cases in point, the court there stated it was not necessary to decide whether the charged violation was a "jailable" offense. Instead, the court devised a new rationale which if valid would

---

[18]Cases following the *Dukes-Mercurio* rationale are *People* v. *Superior Court* (1971) *supra,* 14 Cal.App.3d 935, 945, *Carpio* v. *Superior Court* (1971) *supra,* 19 Cal.App.3d 790, 793, and *Agar* v. *Superior Court* (1971) *supra,* 21 Cal.App.3d 24, 27-28.

justify a full "body search" of each and every traffic offender whom the police propose to transport before a magistrate pursuant to sections 40302 or 40303. Other Courts of Appeal, nevertheless, have scrupulously resisted adoption of the *Morel* rationale. (*People* v. *Millard* (1971) 15 Cal.App.3d 759, 762 [93 Cal.Rptr. 402]; *People* v. *Smith* (1971) 17 Cal.App.3d 604, 607 [95 Cal.Rptr. 229].) Indeed, *Smith* particularly circumscribed the *Morel* rule by insisting it cannot "hold that, as a matter of law, every person who is to be transported in a police vehicle, for any reason, may be subjected to a search . . . . Such a routine invasion of privacy, unsupported by some special necessity, is constitutionally unwarranted." For the reasons discussed herein, we disapprove of *Morel* and its progeny.

As Officer Erickson's search of defendant was unlawful, the evidence discovered as a result of that search was inadmissible. It follows under the substantial evidence test that the record fully supports the trial court's order granting defendant's motion to suppress.[19]

The alternative writ of mandamus is discharged and the peremptory writ is denied.

Peters, J., Tobriner, J., and Sullivan, J., concurred.

**WRIGHT, C. J.**—I concur in the result arrived at by the majority. I feel it necessary, however, to state my views relative to some dicta and certain possible inferences which may be drawn from the majority opinion and with which I would disagree.

The majority holds that the search of defendant cannot be upheld, inter alia, as a search incident to an arrest for automobile theft as there was no probable cause to arrest him for such a crime. I concur. The Attorney General has not shown that the police officer who stopped defendant was aware of facts that would justify a belief that the defendant was in possession of a stolen automobile. Moreover, as the majority points out, the issue was not raised in the trial court and it is too late to raise it for the first time at the appellate level. In light of these facts, I deem it inappropriate to discuss what factors may or may not constitute probable cause to arrest for such an offense. The majority nevertheless speculates on such matters and in doing so not only relies on conclusions that are beyond this court's expertise but also fails to substantiate its conclusions by any authoritative description of actual police practices or experiences. The Attorney General has failed

---

[19]In *Gallik* v. *Superior Court* (1971) 5 Cal.3d 855, 859-860 [97 Cal.Rptr. 693, 489 P.2d 573], we held that *Kiefer* did not "change the law" of probable cause and hence was not merely prospective in effect. For the reasons there explained, our decision in the case at bar will likewise apply to all cases that are not yet final.

to show that in the trial court the prosecution introduced evidence which would support a belief that defendant was in possession of a stolen vehicle, and I would not speculate in dicta which appear to me to be unnecessary.

Further, I read the opinion of the majority as holding that the transportation of a traffic law violator to a magistrate pursuant to Vehicle Code section 40302 or 40303 does not justify subjecting the arrestee to a search. I concur in this holding insofar as it relates to a *full body search*. The majority, however, does not reach the question whether the police may make a *pat-down search* prior to such transportation.[1] I am of the opinion that we should eliminate any doubt and that we should approve a pat-down search in such circumstances.

The United States Supreme Court has set forth a general rationale in the search and seizure area which aids in the resolution of this issue. "In order to assess the reasonableness of [police] conduct as a general proposition, it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' *Camara* v. *Municipal Court,* 387 U.S. 523, 534-535, 536-537 . . . (1967). And in justifying the particular intrusion [there must be] specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry* v. *Ohio* (1967) 392 U.S. 1, 20-21 [20 L.Ed.2d 889, 905-906, 88 S.Ct. 1868].)

The balance of the governmental interest and the intrusion on individual rights, of course, varies with each particular situation. In *Terry* v. *Ohio, supra,* 392 U.S. 1, the court held that before a pat-down search in *non-arrest* circumstances can be made, the officer must have reason to believe he may be dealing with an armed and dangerous individual. On the other hand, in the case of a search incident to a lawful nontraffic arrest a full body search can be made of the arrestee and a search of the immediate area under his control from which he might take a weapon or destroy evidence

---

[1]The majority does not reach this question because even if the pat-down search is valid, the soft object which was found would not justify the full search that was made. (*People* v. *Mosher* (1970) 1 Cal.3d 379, 394 [82 Cal.Rptr. 379, 461 P.2d 659].)

The question of the validity of a pat-down search incident to transportation is, of course, separate from the one whether the police may conduct a pat-down search as an incident to a citation for a traffic violation. Without the additional element of the transportation or other justification, it is clear that such a pat-down search is invalid.

is also permitted. (*Chimel* v. *California* (1968) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].)

The custody of a person who is to be transported to a magistrate is different from the "custody" of the *Terry* "stop and frisk" situation, and is indeed similar to the custody of someone who is searched incident to an arrest on a criminal charge before being transported to a detention facility. It is clear that the balance between the factors involved—the safety of the police officer required by law to transport the individual detained and the relatively minor intrusion on privacy of a pat-down search—weighs in favor of permitting pat-down searches in such circumstances.

As the majority points out, this court has recognized the importance of protecting police officers against unnecessary exposure to risk of danger and of according due weight to this factor in justifying limitations on an individual's constitutional rights. We have said: "We are not unmindful of the dangers daily faced by the men who bear the burden of policing our streets and highways, and of the fact that even a minor traffic citation incident can occasionally erupt into violence. We agree with the United States Supreme Court that 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. . . .' The courts should do all in their constitutional powers to minimize these risks." (*People* v. *Superior Court* (*Kiefer*) (1970) 3 Cal.3d 807, 829 [91 Cal.Rptr. 729, 478 P.2d 449], quoting from *Terry* v. *Ohio*, 392 U.S. at p. 23 [20 L.Ed.2d at p. 907].)

The safety of police officers is one of the primary justifications for a search without a warrant incident to an arrest. In *Chimel* the court said: "A similar analysis underlies the 'search incident to arrest' principle, and marks its proper extent. When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise the officer's safety might well be endangered, and the arrest itself frustrated. . . ." (395 U.S. at pp. 762-763 [23 L.Ed.2d at p. 694].)

It is important to note that, in a search incident to an arrest other than for a misdemeanor traffic violation, the validity of a search for weapons on or within reach of the arrestee does not depend on the nature of the crime for which the person was arrested. The search for weapons is valid even where the crime was a nonviolent one. (Cf. *Preston* v. *United States* (1964) 376 U.S. 364, 365 [11 L.Ed.2d 777, 779, 84 S.Ct. 881].) Thus, it is an oversimplification of the factual situation to say pat-down searches cannot be allowed incident to the transportation of traffic arrestees because

generally traffic law violators are not armed. There is no more reason to believe a person arrested for petty theft (Pen. Code, § 488) is armed than an automobile driver without identification whose nonconforming conduct requires that he be taken before a magistrate.

The critical factor in these or similar situations is not the greater likelihood that a person taken into custody is armed, but rather the increased likelihood of danger to the officer *if* in fact the person is armed. When it becomes necessary that an officer confine a traffic law violator within his police vehicle, the officer risks the danger that the violator may be armed with and draw a weapon. This danger is not necessarily eliminated by handcuffing the traffic law violator as he may still be able to reach a weapon secreted on his person. And, incident to the entire process of transportation, it may be impossible for the officer to keep the violator under constant surveillance by reason of the requirements of driving the vehicle and other responsibilities.[2] In my opinion, the specifically articulable fact of the increased danger to the officer reasonably warrants the limited or relatively minor intrusion of the pat-down search in those instances when traffic law violators are transported to a magistrate pursuant to the provisions of Vehicle Code sections 40302 or 40303.[3]

Further, the problem of extended detention of a traffic law violator who is transported before a magistrate pursuant to the provisions of Vehicle Code sections 40302 or 40303 and who cannot make bail or who is not released on a written promise to appear, demands that certain precautionary measures be taken thereafter. I do not read the majority opinion to imply otherwise. When the detention is brief, as in *Terry,* the problem is simple and few if any measures need be taken. When the detention is for a lengthened period of time, however, its character changes. The safety of police personnel and others and the integrity of detention facilities require that greater security measures be employed.

If in the instant case defendant had not been searched at the scene of the arrest but had been taken to a magistrate and was unable to meet bail requirements within a relatively short period, police officers would have to

---

[2]Even if it is assumed that a pat-down search is sometimes unnecessary because of other protective measures, we cannot assume that all peace officers who transport traffic law violators (see Veh. Code, § 40300) will always have access to such measures.

[3]The intrusion would seem to be no greater than the statutorily required "seizure" of the traffic law violator (*Terry* v. *Ohio, supra,* 392 U.S. 1, 19 [20 L.Ed.2d 889, 904]) and his forced ride to the magistrate (generally in handcuffs).

detain him until bail money or a bond could be posted.[4] Clearly in such a situation the police would be entitled to make a full search of defendant at that point in time prior to detaining him further. It would be an unreasonable burden to require law enforcement officers to segregate the person detained in some remote area of the custodial facilities removed from the jail population or assign an officer to watch over the arrestee until the required bail is posted which may be hours or days later. The safety of those detaining him, the safety of others, and the prevention of the introduction of contraband into the custodial facility require that such a person be subjected to a full search. (*People* v. *Superior Court* (*Fuller*) (1971) 14 Cal. App.3d 935, 945 [92 Cal.Rptr. 545] and cases cited; *People* v. *Munsey* (1971) 18 Cal.App.3d 440, 448 [95 Cal.Rptr. 811]; cf. *People* v. *Ross* (1967) 67 Cal.2d 64, 70 [60 Cal.Rptr. 254, 429 P.2d 606], reversed on other grounds, *sub nom. Ross* v. *California,* 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]; cf. also *Davis* v. *Reynolds* (N.D.Fla. 1970) 319 F.Supp. 20, 22.) The reasons for the rule apply to the detention of a traffic law violator who is unable to meet bail as well as to the detention of an arrestee who is booked on a criminal charge.

I am of the opinion that a pat-down search prior to the transportation of a traffic law violator pursuant to Vehicle Code sections 40302 or 40303, and a full search incident to extended detention awaiting posting of bail are both reasonable and constitutional searches. Because I read the majority opinion as implying nothing to the contrary, I concur in that opinion.

A valid pat-down search incident to the transportation in the present case, however, does not validate the entire search since the finding of the soft object did not give reasonable cause to believe defendant had a weapon. (*People* v. *Mosher* (1970) 1 Cal.3d 379, 394 [82 Cal.Rptr. 379, 461 P.2d 659].) Thus, the evidence discovered as a result of the search was inadmissible and the trial court properly granted defendant's motion to suppress.

**BURKE, J.**—I agree with the views expressed by Chief Justice Wright in his concurring opinion.

I disagree, however, with certain statements constituting dictum of the

---

[4]The language of the majority that the traffic law violator "must *immediately* be released on bail or written promise to appear" (*ante,* p. 209) cannot mean that if the magistrate feels bail is necessary and if the violator cannot meet bail, he must be released on a written promise to appear. Such a result would not only contravene the Legislature's purpose of receiving satisfactory assurance the violator will appear later, but would make senseless the statutory requirement that the violator be taken before a magistrate at all. The option as to whether the traffic law violator is to be released on bail or written promise is that of the magistrate, not of the traffic law violator, and the statutory provision is satisfied when the magistrate makes one or the other alternative available.

majority, which are not mentioned by the Chief Justice. The statements as I read them, suggest that (1) the arresting officer's *subjective* belief regarding defendant's guilt of auto theft is of critical importance in determining the legality of the arrest and (2) the legality of an arrest is tested solely on the basis of the legal theory employed by the officer in making the arrest. The statements in the first category are erroneous for the reasons stated in my concurring and dissenting opinion in *People* v. *Miller (post,* p. 219 [101 Cal.Rptr. 860, 496 P.2d 1228]). As we shall see, the statements in the second category are likewise erroneous.

Under views expressed by United States Supreme Court justices the legality of an arrest is not tested—as the majority here indicate—solely on the basis of the legal theory employed by the officer in making the arrest. In *Wainwright* v. *City of New Orleans,* 392 U.S. 598 [20 L.Ed.2d 1322, 88 S.Ct. 2243], wherein the court dismissed a writ of certiorari as improvidently granted, a concurring opinion by Justice Fortas (joined in by Justice Marshall) states (at p. 599 [20 L.Ed.2d at pp. 1322-1323]) that he is "not prepared to say that, regardless of the presence or absence of adequate cause for police action, the arrest [made on a charge of vagrancy while loitering] or the attempt by the officers to search [at the police station following the arrest] is unlawful" and that he "should want to know whether, in fact, there was constitutionally adequate cause for the police to suspect that the [petitioner] was the man sought for murder." A dissenting opinion by Chief Justice Warren expresses disagreement with Justice Fortas and states (at pp. 604-605) that it is irrelevant that the record does not permit a determination whether the petitioner could have been lawfully arrested for murder since he was not arrested or booked for murder. According to the dissent (at p. 606, fn. 6), "when a controversy arises over the legality of the arrest, the police should be held to the booked offense." The booked offense, of course, may differ from the offense the officer had in mind as the basis for the arrest. Thus both the foregoing views are contrary to the majority opinion in the instant case.

Both federal and state courts have upheld arrests on grounds other than that relied upon by the officer in making the arrest. (E.g., *Klingler* v. *United States* (8th Cir. 1969) 409 F.2d 299, 304 [defendant arrested for vagrancy; held that there was not probable cause to arrest him for that crime but that the arrest was lawful since there was probable cause to arrest him for robbery]; *State of South Dakota* ex rel. *Thunderhorse* v. *Erickson,* 328 F.Supp. 1149 [facts similar to *Klingler*]; *People* v. *Superior Court (Johnson),* 15 Cal.App.3d 146 [92 Cal.Rptr. 916] [defendant arrested for "investigation of burglary"; held that stated ground was inadequate but arrest was lawful since there was probable cause to believe him guilty of disorderly conduct

and burglary and attempted burglary]; *People* v. *Kelley*, 3 Cal.App.3d 146 [83 Cal.Rptr. 287] [defendant arrested for drunk driving; held unnecessary to determine if probable cause to arrest him for that offense since there was probable cause to arrest him for being found in a public place under the influence of intoxicating liquor and possession in car upon highway of alcoholic beverage in open container]; *People* v. *Walker*, 273 Cal.App.2d 720, 725 [78 Cal.Rptr. 439] [defendant arrested for robbery; held unnecessary to determine if probable cause to arrest him for that offense since there was probable cause to arrest him for possession of concealed weapons]; *Commonwealth* v. *Lawton*, 348 Mass. 129 [202 N.E.2d 824, 826] [defendant arrested for being abroad in the nighttime; held unnecessary to decide constitutionality of statute proscribing that offense since there was probable cause to arrest for breaking and entering, and arrest was therefore lawful]; see generally American Law Institute, A Model Code of Pre-arraignment Procedure (Proposed Official Draft No. 1, April 10, 1972) at pp. 15-17 & 136.)

Penal Code section 841 requires that an officer inform the person to be arrested of, among other things, "the cause of the arrest." However, a failure to announce the cause of the arrest does not invalidate the arrest or search incident thereto (see *People* v. *Maddox*, 46 Cal.2d 301, 305 [294 P.2d 6]), nor does the officer's announcement of the wrong offense have that effect (*People* v. *Farley*, 20 Cal.App.3d 1032, 1037 [98 Cal. Rptr. 89]; *People* v. *Kelley, supra*, 3 Cal.App.3d 146, 151).

The majority claim that *Agar* v. *Superior Court*, 21 Cal.App.3d 24 [98 Cal.Rptr. 148], contains "an excellent analysis" of the point that an arrest cannot be justified by theories invented after the arrest. I disagree. *Agar* states, inter alia, that although probable cause is measured by an objective standard "it must first be established that the policeman *did* entertain a belief that a particular crime had been committed [by the person arrested]." The quoted statement is not required by the authority there cited and is erroneous for the reasons stated in my concurring and dissenting opinion in *People* v. *Miller, supra*.

*Agar* also states that although in some contexts it concurs with the proposition that "a mere mistake by an officer in stating the legal basis or theory for the arrest is not sufficient to make an arrest illegal" each of the cases there cited "assumes that the arresting officer had in mind the conduct to which both charges related" and that "courts have not approved the making out of whole cloth an arrest for an offense never contemplated (or if contemplated, rejected) by the officer . . . ." However, an arrest is not made out of "whole cloth" if there was probable cause to believe the arrestee guilty

of a felony, and courts have upheld arrests and searches incident thereto where the proper basis for the arrest was rejected or so far as appears not contemplated by the arresting officer, and the conduct the officer had in mind as the basis for the arrest was not the conduct for which the court concluded that a lawful arrest could be made. (See, e.g., *Klingler* v. *United States, supra,* 409 F.2d 299; *People* v. *Walker, supra,* 273 Cal.App.2d 720, 725.)

The only other authority cited by the majority is dictum in *People* v. *Superior Court (Fuller),* 14 Cal.App.3d 935, 949-950 [92 Cal.Rptr. 545], and *Guevara* v. *Superior Court,* 7 Cal.App.3d 531, 535 [86 Cal. Rptr. 657]. Neither case cites any authority to support the dictum, and *Guevara* was not concerned with the question of the lawfulness of an arrest.

In the instant case defendant was arrested for ordinary traffic violations and, as the majority herein point out, absent special circumstances a search cannot be made of the driver as an incident to an ordinary traffic arrest. However, special circumstances would have been present had there been probable cause to arrest for a felony. In any event the broad language of the majority opinion is not limited to the facts of this case.

I would disapprove cases such as *Agar* v. *Superior Court, supra,* 21 Cal. App.3d 24, and *People* v. *Superior Court (Fuller), supra,* 14 Cal.App.3d 935, to the extent they are inconsistent with the views I have expressed herein.

McComb, J., concurred.