[Crim. No. 15620. Second Dist., Div. Five. Nov. 5, 1969.]

THE PEOPLE, Plaintiff and Appellant, v.
LUIS ADAM, Defendant and Respondent.

## COUNSEL

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Plaintiff and Appellant.

Richard S. Buckley, Public Defender, John Hayes, James L. McCormick and Steven Kaye, Deputy Public Defenders, for Defendant and Respondent.

## OPINION

**KAUS, P. J.**—The People appeal from an order setting aside an information charging defendant with possession of marijuana. (Health & Saf. Code, § 11530.)

The only witness who testified at defendant's preliminary hearing was Officer Cron of the Los Angeles Police Department. On March 15, 1968, at 1:30 p.m. Cron and another officer, wearing plain clothes, were in an unmarked police vehicle. Cron saw defendant driving a 1956 Buick, the left windwing of which was broken. Defendant's physical description was "similar" to that of a burglary suspect who on an unspecified earlier date had stolen a 1964 or 1965 Volkswagen from a garage in the "immediate" area. The description he had of the suspect was: "a male Mexican, 23 to 26, five ten, 160 pounds, black hair." Defendant was southbound on Silverlake Boulevard. From time to time the officer saw him look to the rear toward the police vehicle. Defendant's car was swerving from side to side without, however, crossing the center line. After following defendant for about five blocks, the officers stopped him. Cron approached defendant who was still sitting in his car. They had a short conversation. Defendant produced a valid driver's license and a registration for the car which corresponded with the name and address on the license. Defendant's pupils

appeared dilated and his speech slurred. The officer did not smell alcohol. Defendant was then asked to step out of the vehicle. His stance was slightly unsteady. The officer then observed that defendant "closely fit the description of the burglary suspect." This, presumably, meant that defendant was a male Mexican, 23 to 26 years old, 5'10" tall, weighing 160 pounds and possessed of black hair. At that point the officer gave defendant a "cursory search" for weapons. As he passed his hand over defendant's right shirt pocket he felt "what appeared to be hand-rolled cigarettes." He asked defendant what he had in his pocket. Defendant said that he had papers. Cron pointed out to him that they were all rolled up and wanted to know how many "sticks of weed" defendant had. Defendant replied: "Four." At this point he was placed under arrest. Marijuana was then removed from his pocket. It consisted of four hand-rolled and a partially burned cigarette contained in a black cloth sack.

The magistrate apparently believed that the officer was able to tell the difference between hand rolled and manufactured cigarettes, contained in a cloth sack, inside a shirt pocket, just by "passing" his hands over the pocket. He also felt that the cursory search was proper because: "If they don't, . . . they would be booking everybody for suspicion. . ."[1]

The superior court held that in order to detect the physical nature of the cigarette, the officer necessarily had to have made more than a cursory search for weapons.

We do not reach that point.

We note at the outset that at no time have the People claimed that defendant's manner of driving, his speech and appearance gave Cron the right to arrest him for an apparent violation of section 23105 of the Vehicle Code (driving under the influence of a narcotic) or a similar offense. If the facts known to the officer, viewed objectively, justified such an arrest, it would make no difference that he proceeded more cautiously. (*People* v. *Chimel*, 68 Cal.2d 436, 440-441 [67 Cal.Rptr. 421, 439 P.2d 333], revd. on other grounds sub nom. *Chimel* v. *California*, 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].) Nor would this court be bound by any concession that no arrest was justified. (*Desny* v. *Wilder*, 46 Cal.2d 715, 729 [299 P.2d 257]; *People* v. *Mooney*, 175 Cal. 666 [166 P. 999]; cf. *Henry* v. *United States*, 361 U.S. 98, 104-105 [4 L.Ed.2d 134, 139-140,

---

[1]This somewhat startling statement, which seems to justify one invasion of privacy by reasoning that, were it not permitted, the police would commit an even more serious one, is probably just a compendious way of stating the rationale of *People* v. *Mickelson*, 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658] that the recognition of the right to effect temporary detentions for questioning "wards off pressure to equate reasonable cause to investigate with reasonable cause to arrest, thus protecting the innocent from the risk of arrest when no more than reasonable investigation is justified."

80 S.Ct. 168], Clark, J. dissenting.) The reason why we must ignore—and why the superior court properly ignored—the fairly tenable theory that Cron was entitled to make a full-blown arrest (cf. *People* v. *Cano,* 241 Cal.App.2d 484, 487, fn. 1 [50 Cal.Rptr. 654]) is that at no time was defendant put on notice that he was facing such a claim. (*Giordenello* v. *United States,* 357 U.S. 480, 487-488 [2 L.Ed.2d 1503, 1510-1511, 78 S.Ct. 1245]; cf. *People* v. *Hamilton,* 71 Cal.2d 176, 182 [77 Cal.Rptr. 785, 454 P.2d 681].) Had there been any hint that such was the People's contention, defendant would have been more motivated to adduce whatever evidence he had, which showed that his driving and physical condition were not as described. (*Jennings* v. *Superior Court,* 66 Cal.2d 867, 880 [59 Cal.Rptr. 440, 428 P.2d 304].)[2]

Defendant claims that the officers did not even have the right to stop him, let alone order him out of the car. He is certainly mistaken on the first claim (*People* v. *Henze,* 253 Cal.App.2d 986, 990 [61 Cal.Rptr. 545]; *People* v. *Anguiano,* 198 Cal.App.2d 426, 429 [18 Cal.Rptr. 132]) and probably also on the second.[3]

The People on the other hand, satisfied that there was nothing wrong with stopping the car and ordering the defendant out, do not fully appreciate the height of the next hurdle, namely proof that the circumstances warranted a pat-down for offensive weapons. They simply state: "The People submit that as a part of the investigation it was proper to ask defendant to step from the car, and to conduct a pat-down for offensive weapons. In so doing the officer was only taking ordinary precautions for his own safety. This is well recognized as proper. . . ."

The right to detain temporarily and to make a superficial search for weapons "if the circumstances warrant it" was recognized in *People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]. In 1963, when *Mickelson* was filed, the United States Supreme Court had not pronounced itself on the problem. It did so five years later in *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]. Just as our own Supreme

---

[2]A defendant may have evidence which, reasonably, might defeat a claimed right to arrest even though it would not detract from the right to make a mere investigatory stop.

[3]The People cite several cases on the point, but the trouble is that in all the cases cited there is some specific reason, such as the officer's safety or the need to look for the car's registration. (*People* v. *Galceran,* 178 Cal.App.2d 312, 316 [2 Cal.Rptr. 901]) which justified the command. (See also *People* v. *Figueroa,* 268 Cal.App.2d 721, 726-727 [74 Cal.Rptr. 74].) There may be authority permitting such orders as a matter of routine, even where no particular reason therefor is shown or articulated. We have not stopped to research the point in depth, because it is immaterial to our decision.

Court had done, it recognized the existence of a right, on the part of the police, to make a self-protective frisk for weapons, provided however that certain conditions are recognized and limitations observed. We are, of course, bound to demand that records show that these conditions and limitations are given effect at the magisterial and trial levels of the judicial process.

The facts of *Terry* should be briefly recalled. An officer had observed two men making an "elaborately casual and oft-repeated reconnaissance" (*Terry* v. *Ohio, supra,* 392 U.S. at p. 6 [20 L.Ed.2d at p. 897]) of a store window. He reasonably concluded that they were "casing a job, a stick-up," and that "they may have a gun." He then confronted them and patted down the outside of Terry's clothing. He felt a pistol in a pocket of the overcoat which he later removed. Characterizing even such a casual frisk as a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, . . . not to be taken lightly," holding that Terry had been "seized" and that the gun had been found as a result of a "search," the court nevertheless found no violation of the Fourth Amendment under the circumstances of the case. Having in mind that it was the officer's proper function to investigate the conduct he had observed, that he had a legitimate interest in making sure "that the person with whom he [was] dealing [was] not armed with a weapon that could unexpectedly and fatally be used against him" (*Terry* v. *Ohio, supra,* 392 U.S. at p. 23 [20 L.Ed.2d at p. 907]), that society cannot ask police officers to take unnecessary risks and that American criminals have a long tradition of armed violence, the court concluded that a limited protective search of the outer clothing of a person whose conduct is being investigated, does not do violence to the Fourth Amendment.

The People interpret *Terry* as if it stood for the proposition that simply because an officer may temporarily "seize" a suspect it follows automatically that he may frisk him for weapons. The *Terry* court went out of its way to negative such a notion. It said emphatically that "in justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 21 [20 L.Ed.2d at p. 906]. Italics added.) In a footnote appended to that statement the court observes: "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence. (Citations omitted.)" (*Terry* v. *Ohio, supra,* 392 U.S. at p. 21, fn. 18 [20 L.Ed.2d at p. 905].) The text goes on to say: ". . . And in making that assessment it is imperative that the facts be judged *against an objective standard*; would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken

was appropriate? Cf. *Carroll* v. *United States,* 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790] (1925); *Beck* v. *Ohio,* 379 U.S. 89, 96-97 [13 L.Ed.2d 142, 147, 148, 85 S.Ct. 223] (1964). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial that inarticulate hunches, a result this Court has consistently refused to sanction. See, *e.g., Beck* v. *Ohio, suprà; Rios* v. *United States,* 364 U.S. 253 [4 L.Ed.2d 1688, 80 S.Ct. 1431] (1960); *Henry* v. *United States,* 361 U.S. 98 [4 L.Ed.2d 134, 80 S.Ct. 168] (1959). And simple ' "good faith on the part of the arresting officer is not enough,"[o] . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effect," only in the discretion of the police.' *Beck* v. *Ohio, supra,* at 97 [13 L.Ed.2d at 148]." (*Terry* v. *Ohio, supra,* 392 U.S. at pp. 21-22 [20 L.Ed.2d at pp. 905-906]. Italics added.)

That this was not idle talk became apparent in *Sibron* v. *New York,* 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889], filed together with *Terry.* We pass over the details which led to the confrontation between an officer and Sibron in the course of which the officer seized heroin from Sibron's person. The New York courts had apparently affirmed Sibron's conviction by applying a New York statute which permitted police officers to stop suspects in certain cases and to search them for weapons if they reasonably suspected that they were in danger of "life or limb." The Supreme Court refused to rule on the constitutionality of the statute and reversed on basic Fourth Amendment principles. However, in adverting to the basis for New York's affirmance of the conviction it said: "Although the Court of Appeals of New York wrote no opinion in this case, it seems to have viewed the search here as a self-protective search for weapons and to have affirmed on the basis of § 180-a, which authorizes such a search when the officer 'reasonably suspects that he is in danger of life or limb.' The Court of Appeals has, at any rate, justified searches during field interrogation on the ground that '[t]he answer to the question propounded by the policemen may be a bullet; in any case the exposure to danger could be very great.' *People* v. *Rivera,* 14 N.Y.2d 441, 446 [201 N.E.2d 32, 35, 252 N.Y.S.2d 458, 463] (1964), cert. denied, 379 U.S. 978 [13 L.Ed.2d 568, 85 S.Ct. 679] (1965). But the application of this reasoning to the facts of this case proves too much. *The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries.* Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. (*Terry* v. *Ohio, supra. Patrolman Martin's testi-*

*mony reveals no such facts.* . . . Nor did Patrolman Martin urge that when Sibron put his hand in his pocket, he feared that he was going for a weapon and acted in self-defense. His opening statement to Sibron—'You know what I am after'—made it abundantly clear that he sought narcotics, and his testimony at the hearing left no doubt that he thought there were narcotics in Sibron's pocket." (*Sibron* v. *New York,* 392 U.S. 46, 63-64 [20 L.Ed.2d 917, 934-935, 88 S.Ct. 1889]. Italics added.)

Applying this teaching to the case at bar we must hold that the trial court's ruling was correct. The record does not contain one single fact from which, by the application of an objective standard, it could be concluded that the officer reasonably thought he was in danger. Even if we interpret his statement that he was looking for weapons as implying that he did so because he thought that this particular confrontation posed personal danger, rather than that he did so because it was routine procedure, there are no "specific and articulable facts," from which a court can infer that his fear was rational. We have a daylight encounter, between a young man, possibly under the influence of something, alone and apparently cooperative, with two police officers who were presumably armed. If, on these bare facts, the police can undertake the "serious intrusion upon the sanctity of a person" whose activities they have decided to investigate, the safeguards written into *Terry* are meaningless.

The order is affirmed.

Stephens, J., and Aiso, J., concurred.

A petition for a rehearing was denied December 3, 1969.