Filed 9/4/20  In re E.B. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re E.B. et al., Persons Coming Under the Juvenile Court Law. | C091370 |
| EL DORADO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.H., <br><br> Defendant and Appellant. | (Super. Ct. Nos. SDP20180019 & SDP20180020) |

A.H., mother of the minors (mother), appeals from the juvenile court's orders terminating her parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  We will affirm the juvenile court's orders.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2018, mother admitted to long-term use of methamphetamine, as did her boyfriend in whose care she left the minors. Pursuant to a voluntary service plan between mother and the El Dorado County Health and Human Services Agency (Agency), mother entered into Progress House to address her extensive substance abuse problem. The Agency initially allowed the minors, E.B. (then age 6) and M.B. (then age 7), to accompany mother at Progress House. However, on June 15, 2018, mother signed a voluntary placement agreement to temporarily place the minors in foster care because she "could not cope any longer." Just four days later, mother informed the Agency she was leaving the program. When the social worker encouraged mother to seek individual counseling and offered to assist mother in self-referring to behavioral health, mother refused. On June 21, 2018, mother left Progress House and the drug treatment program against staff advice.

On June 21, 2018, the Agency filed dependency petitions on behalf of the minors pursuant to section 300, subdivision (b). The petitions were amended twice, eventually alleging failure to protect pursuant to subdivision (b) and no provision of support pursuant to subdivision (g). In part, the amended petitions alleged mother had an extensive substance abuse problem from which she failed or refused to rehabilitate, and she left the agreed-upon drug treatment facility in violation of her agreement.

The Agency reported it was unable to find an appropriate placement for both minors in the same home but was able to place them in separate homes that were close together and afforded them daily interactions with each other. Mother met with the social worker on June 28, 2018, and reported she was 82 days clean and sober. When asked to submit to a drug test, mother eventually agreed but admitted she would test positive for marijuana. The social worker referred mother for an alcohol and other drug (AOD) assessment, individual counseling, and drug testing. The social worker expressed concern that mother continued her relationship with her boyfriend who was known to the

2

Agency as a long-term drug user with a significant child protective services history. Mother countered that she and her boyfriend were "strong together" and "strong in their recovery."

After leaving Progress House, mother made minimal progress in attempting to establish ongoing services. She also tested positive for marijuana. Communication with the Agency was infrequent and difficult due to mother's lack of a telephone or a known address. Mother's behavior and her continued involvement with her boyfriend inhibited her ability to safely care for and protect the minors.

The juvenile court found true the allegations in the amended petitions, striking the allegation that mother's whereabouts were unknown. The court continued the minors in out-of-home placement and ordered twice-weekly supervised visits and weekly telephone calls.

According to the disposition reports filed July 30, 2018, and August 1, 2018, mother had not engaged in services to address her substance abuse issues, had not yet scheduled an AOD assessment, was still testing positive for marijuana, was not keeping scheduled therapy appointments, and was living in an unhealthy and unsafe environment. She attended only two of the four scheduled visits with the minors and had only one telephone call. Mother was referred for an AOD assessment but arrived late. She was scheduled for an intake session for counseling services and provided a bus pass but failed to attend.

At the August 1, 2018, disposition hearing, the court ordered continued out-of-home placement of the minors and continued reunification services to mother.

At the September 26, 2018, case compliance hearing, pursuant to a request from minors' counsel, the juvenile court ordered mother to have a psychological evaluation. Mother completed the evaluation with Dr. Eugene Roeder on October 22, 2018. Dr. Roeder found mother was experiencing a moderately severe mental disorder and required professional, clinical care. He noted her test results were most consistent with

3

generalized anxiety disorder and bipolar disorder in addition to psychoactive substance abuse. Dr. Roeder concluded that in order for mother to successfully reunify with the minors, her underlying psychological problems needed to be adequately addressed, as well as her substance abuse disorder and her interpersonal challenges.

On November 16, 2018, the Agency requested that the court change its visitation order to once per week due to mother's cancellation of numerous visits with the minors. Based on the agreement of the parties, the court changed mother's visitation schedule accordingly.

According to a status review report filed January 30, 2019, E.B.'s foster parent reported an incident between E.B. and the foster parent's five-year-old daughter during which E.B. pulled down the young girl's pants and tickled her private parts. E.B. asked her to touch his private parts, but she said no. E.B. then put his hand over her mouth, grabbed her hand, and put it down his pants. When E.B. was questioned about the incident, he immediately started screaming, " 'no,' " but later admitted it. The foster parent gave a seven-day notice to remove E.B. from the home. This was reportedly the second time E.B. had been caught sexually acting out.

Mother reportedly tested positive for alcohol and continued to use marijuana for " 'emotional balance.' " She made some progress in her case plan objectives but struggled to follow through with substance abuse services. The Agency assessed a substantial risk of returning the minors to mother who had engaged in some services but had not yet fully addressed all of the issues and lacked the insight to acknowledge her shortcomings.

On February 20, 2019, the juvenile court continued mother's reunification services for an additional six months.

The Agency reported on March 29, 2019, that mother engaged in a number of group and individual alcohol and drug treatment sessions but was later discharged due to her failures to attend. Mother missed several drug tests and tested positive for alcohol

4

and marijuana as recently as January and March 2019. The Agency recommended mother make an appointment for a mental health assessment and medication evaluation, but she failed to do so. She was attending individual counseling but had a number of unexcused absences from her parenting education class. She had difficulty abiding by the decreased visitation order of once per week, and on several occasions refused to attend visits after they were scheduled. The Agency became concerned due to mother's desire to end visits earlier than scheduled, and the topics about which mother spoke with the minors, including child predators on the Internet. On one occasion, the visit had to be terminated because mother was yelling at and threatening the social service aide. The Agency noted that M.B. described visits with mother as " 'happiness.' "

On April 24, 2019, the Agency filed a section 388 petition requesting a decrease in mother's visitation with the minors from four to two hours weekly due to cancellation or early termination of visits by mother and cancellation of visits due to mother's inappropriate behavior. The petition argued mother's cancellation of visits resulted in behavioral issues with the minors, including crying spells, angry outbursts, and bedwetting.

On May 3, 2019, minors' counsel filed a section 388 petition requesting the court terminate mother's reunification services and set the matter for a section 366.26 hearing. The petition argued mother failed to visit with the minors and "minimally engaged in her case plan." The petition further argued the minors were "being negatively affected by mother's failure to visit with them," mother was unable or unwilling to care for the minors before their removal, and the minors needed "a stable and permanent home."

In a memorandum filed May 21, 2019, the Agency reported that mother had an AOD reassessment which recommended that she engage in residential drug treatment for 30 days and then transition to intensive outpatient services by spending 90 days in transitional living. Mother was provided with the information and a spot became available for her at Community Recovery Resources, but mother refused to enter

treatment. Mother participated in parenting classes through March 2019. Although the social worker informed mother she could participate in free parenting classes, mother stated she would resume classes when she was financially able to enroll online. Mother also participated in individual counseling and was reportedly improving in her ability to regulate her emotions and reduce her emotional reactivity. Mother submitted to random drug testing on numerous occasions, each time producing positive results for marijuana.

Regarding court-ordered supervised weekly visits with the minors, mother cancelled two visits, ended one visit 20 minutes early, and did not confirm two visits within the required time period. Otherwise, visits were reported to be appropriate.

The hearing on the two pending section 388 petitions commenced on May 29, 2019. With regard to the minors' petition to terminate mother's reunification services, mother's individual therapist, Marcella Araiza, testified mother participated in weekly counseling for nearly eight months and was learning to regulate her emotions. However, Araiza acknowledged mother did not want to attend visits because the "adoption" sign on the front of the building upset her, and that not calling or showing up for visits because mother was upset at the prospect of adoption was not proper regulation of mother's emotions. She also acknowledged that mother was not demonstrating she understood the impact of substance abuse on the minors when she twice opted not to go into drug rehabilitation despite being told to do so. Araiza opined that mother would need at least six more months to manage her mental health symptoms to enable her to care for the minors. Araiza testified she believed mother had not used methamphetamine for over one year, but acknowledged mother continued to use marijuana for sleep.

At the conclusion of the hearing, the parties agreed and the juvenile court ordered that mother would participate in residential drug treatment and ongoing outpatient treatment, the social worker would have the discretion to increase or decrease the frequency and duration of visits, and mother's reunification services would continue until the next review hearing scheduled for July 31, 2019.

The July 2019 status review report stated the minors continued to be placed in separate foster homes within close proximity to one another, had frequent sibling visitation, were doing well in their respective placements, and had developed close and loving relationships with their respective foster parents. However, the respective foster parents raised concerns about sexualized behaviors between the two minors, including showing each other their private parts. In addition, both minors suffered with emotional and mental health concerns. M.B. suffered from enuresis, encopresis, crying spells, anxiety, and emotional dysregulation, some of which tended to increase during times of inconsistent visitation with mother. E.B. suffered from nightmares and angry outbursts which tended to increase when mother's visitation is inconsistent. The minors expressed their strong desire to be adopted by their foster parents in the event there was no reunification with mother.

Mother continued to live with her boyfriend, was unemployed, and was not in compliance with her case plan. She continued to test positive for marijuana and, although she was prescribed medication to treat her anxiety and depression, it was unclear whether she was taking the medication or experiencing any benefits from it. During the reporting period, mother missed over 20 random drug tests. Since her last parenting class in March 2019, mother did not participate in any additional in-person or online parenting classes. Mother regularly participated in individual counseling but had not made any progress in her treatment goal to stay sober and live free from drug dependency due to her marijuana use.

Following the court's May 29, 2019, order for mother to enter residential drug treatment followed by intensive outpatient services, mother ignored the social worker's inquiries about whether she planned on entering residential treatment. As of the date of the report, mother had yet to do so.

While mother's visits with the minors were reportedly appropriate and the minors looked forward to visits, mother's visitation was inconsistent which tended to negatively

impact the minors. The minors displayed "a great sense of sadness and disappointment" when mother cancelled visits. The March 19, 2019, visit had to be terminated early due to mother's failure to follow visitation rules, her verbal threats, and other actions making the visitation supervisor feel unsafe.

Based on mother's lack of progress in the issues that led to removal of the minors, and mother's inconsistency in visitation, the Agency recommended that the court terminate mother's reunification services and proceed with a permanent plan of adoption.

***12-month Contested Review Hearing***

At the 12-month review hearing on August 14, 2019, therapist Araiza testified she had worked with mother in individual counseling every week for over a year. Araiza testified mother was able to utilize the tools she learned to regulate her emotions. She felt mother made substantial progress because mother was able to regulate her emotions, she was sober from methamphetamine, she never talked about drinking alcohol, she was able to manage her anxiety, and she was less emotionally reactive. Araiza admitted she based her opinions of mother's sobriety on mother's self-reporting and without the benefit of any outside information. Araiza opined that, with an additional three to five months of time, mother could complete all of her goals.

On cross-examination, Araiza testified that the only reason mother gave for why the minors were taken away from her was the fact that she was using methamphetamine. When asked if mother understood the impact substance abuse had on the minors, Araiza stated mother knew it upset the minors, but she also felt she was doing a good job taking care of the minors even though she was high. Araiza testified she could not say mother had made enough progress to alleviate the risk of relapsing if the minors were returned to her care.

Araiza testified mother explained she cancelled visits because M.B. saw the adoption sign on the visitation building and "really got upset" and mother did not want to have visits in that building. Araiza admitted it was not good parenting for mother to stop

8

seeing the minors because she was upset about the adoption sign, to not show up for visits after the minors were told they would see mother and were pulled out of school and brought to the visitation facility, or to routinely cut visits short.

The juvenile court found that, while mother had done "a lot of hard work and made some changes," her progress was nonetheless "minimal" and return of the minors to her care would create a substantial risk of detriment. Thus, the court terminated mother's reunification services, set the matter for a section 366.26 hearing, and made visitation orders.

*Section 366.26 Report*

The section 366.26 report filed November 26, 2019, stated the minors remained in their respective foster homes, where they had been since February 2019. Mother was reportedly inconsistent in her visitation throughout the case. At times she prioritized the minors and attended visits as scheduled; at other times, she did not take advantage of the orders allowing her to spend time with the minors. When she did attend visits, she was generally appropriate during part or all of the visits. She demonstrated having a positive connection to the minors during visits but on occasion struggled to maintain appropriate, positive emotions and terminated the visit early. It was noted that, over the recent several months, mother had difficulty managing emotions sufficiently to maintain a positive presence during visits.

The minors reportedly maintained a connection to mother and a desire to maintain contact. However, having been unable to rely on mother to provide them a stable relationship, as evidenced by frequently missed visits, the minors established new and healthy attachments to their respective foster parents, who had maintained consistency and provided the minors with a stable living environment. There had been a consistent pattern of loving interactions between M.B. and her foster parents, as well as consistent communication that everyone wanted to "finish the adoption process and be a family all together." The report noted M.B. was happy and connected to her foster parents and

wanted to be adopted. The same was true for E.B., who reportedly formed and continued to develop a healthy connection to his foster parents.

The report set out each minor's statement concerning placement and potential adoption. M.B. indicated she desired to be adopted by her foster parents and she "nodded her head vigorously and appeared very excited with a huge smile on her face when she was asked if she wanted to be adopted." When asked what she understood adoption to mean, M.B. stated it meant she would become the foster parents' child forever. M.B. noted "it would be difficult not to see her mother anymore and she would be sad but that it would be 'okay' because she would have the foster-adoptive mother forever." The foster parents noted M.B. had taken to spontaneously saying, " 'after I'm adopted' " and then filling in something she would like to do such as travel out of the country to see her adoptive cousins who live outside the United States. M.B. consistently expressed a positive desire and intention to be adopted and seemed to look forward to it.

E.B. immediately gave the "thumbs up" and exclaimed, " 'yea' " when asked if he wanted to be adopted. It was explained that being adopted would likely mean he would not see his mother again for a long time and potentially never see her again. E.B. said, " 'that's okay because I still have this one,' " indicating his foster mother. E.B. explained that adoption meant he would be " 'living with other parents' and it would be forever." He seemed to understand that his foster parents would become his family and it was his desire to move forward with the adoption. When mother reportedly asked E.B. during a visit how he felt about adoption, E.B. sidestepped the question by saying he was " 'sappy' " about it (meaning " 'sad and happy' ") and changed the subject. Like his sister, E.B. began making statements such as " 'when I am adopted' " and finishing with a statement of something he would like to do such as travel out of the state to watch his foster father play championship games. E.B. consistently made positive statements about being adopted and that he looked forward to the day it was final.

10

Concluding it would be more detrimental to maintain mother's parental rights and continue without the permanence of adoption, the Agency recommended termination of parental rights with a permanent plan of adoption by the current foster parents.

*Section 366.26 Hearing*

At the section 366.26 hearing on January 29, 2020, mother testified that she did not want her parental rights terminated. She testified her relationship with M.B. was "[d]eep" and described her relationship with E.B. as "[f]un and silly." When asked how a continuing role in E.B.'s life would benefit him, mother answered, "Just being a positive support" and being there in the event of a medical issue requiring a blood transfusion.

The Agency argued, and minors' counsel agreed, that the minors were adoptable, both generally and specifically, and that mother did not meet her burden to demonstrate the beneficial parental relationship exception applied. Mother's counsel argued the exception applied and objected to termination of mother's parental rights.

The juvenile court adopted the Agency's recommended findings and orders, found the minors adoptable, terminated parental rights, and identified adoption as the appropriate permanent plan.

## DISCUSSION

Mother raises a myriad of claims asserting failures by the juvenile court and the Agency, several of which challenge the court's adoptability finding and the subsequent order terminating parental rights. Several claims assert the applicability of various statutory exceptions to adoption as the permanent plan. The final claim asserts any failure by mother to raise these issues in the juvenile court was the result of prejudicial ineffective assistance of counsel.

The Agency argues mother forfeited all or portions of her claims and, in any event, the claims lack merit. The Agency further argues mother was afforded effective assistance of counsel.

11

As we will explain, some of mother's claims have been forfeited, the claims which have not been forfeited lack merit, and mother received effective assistance of counsel.

## I

### *Consideration of the Minors' Wishes*

Mother contends there is insufficient evidence the juvenile court considered the wishes of the minors. In particular, she claims there was insufficient evidence the social worker determined whether the minors understood the benefits and detriments of adoption versus guardianship, that termination of parental rights would be final and irrevocable, and that there was no guarantee they would be adopted by their current caregivers. Mother also contends the juvenile court was required to ascertain the minors' respective preferences between adoption and guardianship and failed to do so.

To terminate parental rights, "the [juvenile] court must find by clear and convincing evidence that it is likely that the child will be adopted." (*In re Asia L.* (2003) 107 Cal.App.4th 498, 509; see also § 366.26, subd. (c)(1).) There must be "convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.) "Although a finding of adoptability must be supported by clear and convincing evidence, it [(i.e., the determination that it is likely the child will be adopted within a reasonable time)] is nevertheless a low threshold." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

In reviewing the juvenile court's finding for substantial evidence, we give it the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.) That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that each child was likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.) If so, "[i]t is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

12

Here, the juvenile court found the minors adoptable and terminated parental rights, identifying adoption as the appropriate permanent plan. Mother claims the court failed to consider the minors' wishes as required by section 366.26, subdivision (h), which provides that, in all section 366.26 proceedings, "the court shall consider the wishes of the child and shall act in the best interests of the child." (§ 366.26, subd. (h)(1).) We disagree.

Section 366.26, subdivision (h) requires that the court " 'consider the child's wishes to the extent ascertainable' " prior to terminating parental rights. (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1591 (*Leo M.*).) "But the evidence need not be in the form of direct testimony in court or chambers; it can be found in court reports prepared for the hearing." (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 820.) What the court must strive to do is "to explore the minor's feelings regarding his/her biological parents, foster parents, and prospective adoptive parents, if any, as well as his/her current living arrangements. . . . [A]n attempt should be made to obtain this information so that the court will have before it some evidence of the minor's feelings from which it can then infer his/her wishes regarding the issue confronting the court." (*Leo M.*, *supra*, 19 Cal.App.4th at p. 1592.)

Here, the juvenile court confirmed it read and considered the social worker's report and recommendations and took judicial notice of all prior findings, orders, and judgments in the case. There was sufficient evidence in the section 366.26 report upon which the court relied to ascertain the minors' wishes. Both minors were happy and connected to their respective foster parents and wanted to be adopted. When asked whether she wanted to be adopted by her foster parents, M.B. "nodded her head vigorously and appeared very excited with a huge smile on her face." M.B. was able to explain that adoption meant she would become the foster parents' child forever. She acknowledged it would be difficult not to see her mother anymore and she would be sad "but that it would be 'okay' because she would have the foster-adoptive mother forever."

13

She often talked about what she would like to do " 'after I'm adopted,' " and consistently expressed her desire to be adopted. Similarly, E.B. gave the "thumbs up" and exclaimed, " 'yea' " when asked if he wanted to be adopted. He was able to explain that adoption meant he would be living with other parents and would likely not see his mother again for a long time if ever, but said, " 'that's okay because I still have this one,' " indicating his foster mother. Like his sister, E.B. understood his foster parents would become his family and it was his desire to move forward with the adoption, and he often talked about what he would like to do " 'when I am adopted.' "

Mother claims the social worker failed to determine whether the minors understood adoption versus guardianship, the finality and irrevocability associated with termination of parental rights, and that there was no guarantee they would be adopted by their current caregivers. To the extent mother challenges the adequacy of the section 366.26 assessment report, her failure to object on that basis in the juvenile court has forfeited her claim on appeal. " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method." [Citation.]' [Citation.]" (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398.) "This is the general rule, because any other rule would allow a party to deliberately stand by in silence and permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable. [Citations.] The forfeiture doctrine has been applied in dependency proceedings in a wide variety of contexts, including cases involving failures to obtain various statutorily required reports [citation]." (*Ibid.*) As relevant here, "failure to object to the admission of improper or inadequate evidence waives the right to raise the issue on appeal. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 307, p. 317.)" (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 411; accord *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846; *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886.)

Mother argues, without citation to authority, that the juvenile court was required to obtain the minors' respective preferences between adoption and guardianship. Claims made without citation to authority must be deemed forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B) [each point in appellate brief must be supported by argument and, if possible, by citation of authority]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [lack of authority or analysis constitutes forfeiture].) In any event, section 366.26, subdivision (h) neither expressly requires, nor does it contain language compelling that it be inferred, that a court must ascertain whether a child prefers adoption over guardianship, or vice versa. What the court must strive to do is "to explore the minor's feelings regarding his/her biological parents, foster parents, and prospective adoptive parents, if any, as well as his/her current living arrangements." (*Leo M.*, *supra*, 19 Cal.App.4th at p. 1592.) There is sufficient evidence the juvenile court did so here.

## II

### *Sibling Relationship Exception to Adoption*

Mother contends that, in assessing the minors' bests interests and whether termination of parental rights would be detrimental to them, the Agency and the juvenile court improperly relied on "the illusory promise and premise of ongoing sibling visitation," requiring reversal and remand for the court to reconsider whether termination of parental rights was appropriate.

The Agency argues mother's claim is a veiled attempt to raise the applicability of the sibling relationship exception to adoption, a claim mother forfeited for not raising it below and, in any event, the claim lacks merit. We agree with the Agency.

Taking issue once again with the content of the Agency's assessment report, mother argues the report improperly relied on the promise or expectation of continuing posttermination visitation between the siblings by including statements regarding the close friendship and connection between the minors' respective foster families and that it was "anticipated this connection will continue so the children have the opportunity to

15

maintain their familial connection in spite of living in separate homes." Again, to the extent mother challenges the adequacy of the section 366.26 assessment report, her failure to object on that basis in the juvenile court has forfeited her claim on appeal. (*In re Crystal J., supra*, 12 Cal.App.4th at p. 411; *In re Aaron B., supra,* 46 Cal.App.4th at p. 846; *In re Urayna L., supra*, 75 Cal.App.4th at p. 886.)

To the extent mother is claiming the applicability of the sibling relationship exception to adoption, she has forfeited that claim as well by failing to assert it in the juvenile court. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291-292; *In re Erik P.* (2002) 104 Cal.App.4th 395, 403; *In re Christopher B.* (1996) 43 Cal.App.4th 551, 558; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501-502.)

### III

### *Forfeiture*

Acknowledging her counsel did not raise the issue of the sibling relationship exception to adoption in the juvenile court, mother makes four claims as to why we should nonetheless reach the issue. None have merit.

First, mother claims, without citation to specific authority, that the Agency put the matter at issue based on its inclusion of information in its report about the sibling relationship and the connection between the two respective foster families. Claims made without citation to authority must be deemed forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Atchley v. City of Fresno, supra*, 151 Cal.App.3d at p. 647.) In any event, the fact that the Agency's report included information regarding the bond between the minors does not excuse mother's forfeiture of her claim. It was mother's burden to prove one of the exceptions to adoption applied. (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437-438; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) Mother put on no evidence to show the sibling relationship exception to adoption applied. By not raising the exception, the Agency and the minors were prevented from having a full and fair opportunity to present evidence on the issue at the hearing. We will not review the

16

evidentiary support for the findings when the Agency and the minors were not provided a fair opportunity to present an adequate record in response. (See *People v. Adam* (1969) 1 Cal.App.3d 486, 489.)

Second, mother asserts the oft-cited rule that forfeiture can be excused when there is an important legal issue, the resolution of which would further the minors' interests. She argues the important legal issue is whether the Agency's "reliance on the unenforceable promise and expectation of continuing sibling visitation by foster parents is proper." Mother's argument is not well taken. The section 366.26 report, a 25-page document, includes several references to the relationship between the respective foster families and their commitment to continued visitation and contact between the two minors after termination of parental rights. It was mother's burden to affirmatively demonstrate substantial interference with the sibling relationship. The evidence that the current foster families intended to maintain the sibling relationship to the extent possible was unrefuted by mother with any contrary evidence. In addition to the section 366.26 report, the juvenile court considered mother's testimony and the court's previous findings and orders in the case. There is no indication in the record that the court gave any particular weight to the foster families' statements of commitment to continued sibling visitation. Again, if mother took exception to all or any portion of the report, it was incumbent upon her to lodge an objection and attempt to correct the record as she saw fit. She did not do so.

Third, mother restates her earlier claim that the Agency improperly relied on the expectation of continuing visitation and contact between the two minors' respective foster families. As previously discussed, the claim lacks merit.

Fourth, mother asserts that any failure to raise the issue in the juvenile court was the result of ineffective assistance of counsel. The burden is on mother to establish both that counsel's representation fell below prevailing professional norms and that, in the absence of counsel's failings, a more favorable result was reasonably probable. (*People*

17

*v. Ledesma* (1987) 43 Cal.3d 171, 215-218; *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698]; *In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1540.) We must affirm the judgment unless the record "affirmatively establishes counsel had no rational tactical purpose for the challenged act or omission . . . ." (*Kristen B.,* at p. 1541.) In addition, we may reject mother's claim if she cannot show it is reasonably probable the result would have been more favorable to her but for trial counsel's alleged failings. (*In re N.M.* (2008) 161 Cal.App.4th 253, 270.)

Here, mother cannot establish either prong. Mother argues there could be no tactical reason for counsel not to raise the issue of the sibling relationship exception. We disagree. The sibling relationship exception applies only when adoption would result in "substantial interference with a child's sibling relationship." (§ 366.26, subd. (c)(1)(B)(v).) It is undisputed that the minors had a close bond with one another. As demonstrated by the record, the minors were initially placed together but were then separated in February 2019 and placed with separate foster families due to more than one incident of sexualized behavior between them. Thereafter, despite being placed in separate homes, the minors were able to see each other frequently, visit at each other's houses, and engage in numerous activities while under the supervision of their respective foster parents. It was anticipated that the minors would be adopted by their respective foster parents who intended to maintain contact and visitation between the two minors, a fact that was not refuted by mother. While mother spends a great deal of time discussing authority regarding the juvenile court's lack of jurisdiction to order continuing visitation after termination of parental rights and that continued visitation and contact between siblings is not guaranteed, there was no evidence before the court that adoption would interfere with the minors' relationship. Consequently, trial counsel had a rational tactical reason not to assert the exception and it is not reasonably probable the result would have been more favorable to mother had her counsel done so. Mother has not met her burden to establish ineffective assistance of counsel.

Lastly, we reject mother's assertion, made under the section heading arguing against forfeiture of the sibling relationship exception, that the Agency should have recommended a plan of legal guardianship rather than adoption. Aside from violating the rule of appellate procedure that each point must be stated under a separate heading (Cal. Rules of Court, rule 8.204(a)(1)(B)), mother ignores the rule that where, as here, the juvenile court finds the minors adoptable and no exceptions apply, "it is presumed, even in the absence of a specific finding by the court, that adoption is the choice that is in the child's best interests," and " 'the less desirable and less permanent alternatives of guardianship and long-term foster care need not be pursued.' [Citation.]" (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799.)

For all of these reasons, mother has forfeited her claim on appeal and, in any event, the claim lacks merit.

## IV

### *Visitation Orders Prior to Section 366.26 Hearing*

Mother contends she was deprived of her right to due process and an ability to establish the beneficial parental relationship exception to adoption due to the juvenile court's "elimination of meaningful visitation" pending the section 366.26 hearing.

The Agency argues mother is precluded from raising her contention because she did not first raise it in a writ petition as required by section 366.26, subdivision (*l*).

We conclude mother is precluded from raising this contention because she did not raise it in a petition for an extraordinary writ following the juvenile court's order setting the section 366.26 hearing at which the contested order was made.

"Section 366.26, subdivision (*l*) bars review of a [setting] order unless the parent has sought timely review by extraordinary writ." (*In re Rashad B.* (1999) 76 Cal.App.4th 442, 447, fn. omitted.) The bar applies to all orders issued at a "hearing at which a setting order is entered." (*In re Anthony B.* (1999) 72 Cal.App.4th 1017, 1023.)

19

An order setting a permanency planning hearing date cannot be appealed at any time unless the appellant previously filed a petition for extraordinary writ review raising the same issue. (§ 366.26, subd. (*l*)(1)(A)-(B); Cal. Rules of Court, rules 8.450 & 8.452.) The failure to file a timely petition for writ review precludes any subsequent review of the findings and orders made pursuant to section 366.26, even if the contention relates only to contemporaneous orders that would otherwise be appealable. (See § 366.26, subd. (*l*)(2); *In re Rashad B., supra*, 76 Cal.App.4th at pp. 447-448; *Karl S. v. Superior Court* (1995) 34 Cal.App.4th 1397, 1403-1404 [time requirements are mandatory].)

At the 12-month review hearing on August 14, 2019, the juvenile court terminated mother's reunification services, set the matter for a section 366.26 hearing, and made visitation orders decreasing the frequency of mother's visits with the minors over a period of months. Mother was present with counsel, who objected to the visitation order. Mother was orally advised of the requirements for challenging the court's order by way of writ petition, along with the time frame for so doing, and was served in person at the hearing with the appropriate writ notices and forms. Mother, however, did not file a petition for extraordinary writ. By not seeking review of the visitation order in a timely manner by extraordinary writ, she is barred from challenging the order entered at that hearing in this appeal.

Mother acknowledges these rules but argues her challenge should nonetheless be decided because (1) the controversy was not ripe by the time the writ petition was due, (2) failure to pursue an extraordinary writ is excusable for good cause, especially where the validity and sufficiency of the writ advisement is in question, and (3) the failure to file a writ petition resulted from ineffective assistance of counsel. None of these arguments are persuasive.

As for the first assertion, mother argues the controversy was not ripe because, at the time of the August 2019 hearing, it was unknown whether, among other things, visitation would be increased or decreased, whether mother would have suffered

20

prejudice from reduction of visitation, or whether the reduction in visitation would in fact have resulted in a deprivation of mother's constitutional rights. However, these arguments could be made in every case involving a visitation order made when the section 366.26 hearing is set. And mother cites no authority for the proposition that this exception to the general forfeiture rule of ripeness circumvents the specific statutory mandate of section 366.26, subdivision (*l*). In any event, the fact that mother objected to the visitation order strongly suggests that mother had enough information to know a challenge needed to be made within the requisite time constraints.

As to the second assertion, mother argues there is good cause to allow the challenge because the writ advisement was made as to the termination of services and setting the section 366.26 order but before the visitation order was made, thus creating uncertainty as to whether the visitation order was encompassed in the setting order. The claim is specious. At the contested August 14, 2019, hearing, the Agency's recommendations regarding, among other things, termination of reunification services and decreasing visitation were at issue. The issue of visitation was discussed at length during the hearing and by mother's counsel during closing arguments. Mother's counsel raised an objection to the proposed language in the visitation order immediately after the court issued the writ advisement, requiring a brief discussion amongst the parties and the court about the details of the visitation order. In response to the parties' agreement, the court referred to the portion of the Agency's proposed order and modified that proposed order. The court's written order includes the visitation order with those interlineated modifications. We conclude there is no good cause to excuse mother's failure to pursue an extraordinary writ.

Regarding mother's third assertion of ineffective assistance of counsel, mother refers us to the arguments in section IV of her opening brief, but this section contains no assertion of ineffective assistance of counsel. Mother has not met her burden to establish ineffective assistance of counsel.

21

# V

## *Ineffective Assistance of Counsel*

Finally, mother contends that, in the event we deem any of her previous claims to be forfeited due to the inaction of her counsel, we should reach the merits of those claims due to ineffective assistance of counsel.  As already explained in this opinion, we conclude some of mother's claims have been forfeited, the claims that have not been forfeited lack merit, and mother received effective assistance of counsel.

## DISPOSITION

The juvenile court's orders are affirmed.


 /s/
HOCH, J.



We concur:



 /s/
BLEASE, Acting P. J.



 /s/
MAURO, J.